UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF JEFFERY NOTTESTAD, by its
Special Administrator Arianne Clark

                    Plaintiff,                  CASE NO. 21-CV-535

v.

LA CROSSE COUNTY, and
ADVANCED CORRECTIONAL HEALTHCARE, INC.,

                    Defendants.

---

## BRIEF IN SUPPORT OF SUMMARY JUDGMENT

---

La Crosse County (hereinafter "County"), by its attorneys, MUNICIPAL LAW & LITIGATION GROUP, S.C., respectfully submits the following Brief in Support of its Motion for Summary Judgment.

## INTRODUCTION

Mr. Nottestad died in La Crosse County Jail of multiple transmural duodenal ulcers perforating through the duodenum and into the peripancreatic fat, resulting in a gastrointestinal hemorrhage. His Estate sues the Jail's medical provider, Advanced Correctional Healthcare, Inc. (ACH) under one cause of action and its nurses who tended to him under another cause of action, both of which allege indifference to his serious medical needs.  In disjointed fashion, the Estate also sues the County claiming conditions of confinement were cruel and unusual in violation of the Eighth Amendment because he allegedly lied around in feces and urine for hours at a time and crawled around his cell like an animal pursuant to the jail's policies, procedures and practices.

The Estate has settled with the nurses and they have been dismissed, leaving one cause against ACH for medical care and one cause against the County for the cruel and unusual punishment claim.

This motion is submitted on behalf of the County.  The full record in this case belies the accusations that Mr. Nottestad was forced into inhumane conditions.  The video, testimony and medical reports all reflect reasonable and humane treatment of an individual who presented with various challenges, starting with his discharge from the hospital to the jail with instructions to guard against his suicidal ideation, not to watch for his ulcer-related physical health.  Even assuming there could have been better choices or decisions, the Eighth Amendment is not offended by the situation here.

More importantly as it relates to the ultimate disposition of this case, the Estate has neither adequately pled nor can it show a *Monell* claim to support entity liability against the County for several reasons, not the least of which is that there is a gaping hole in causation for the Estate to contend that his conditions of confinement caused his injuries and death.  Indeed, the Estate has not presented any expert with any opinion tying-up the myriad of complex medical issues involving Mr. Nottestad's death with any conditions of his confinement.  Where there is an absence of any expert medical opinion demonstrating a causal relationship between the conditions in Nottestad's cell and his death, the *Monell* claim cannot be sustained against the County. The "required link" between the actions of the Defendant and the Nottestad's death is missing, and no reasonable jury could infer from the record before the Court that conditions in Nottestad's cell caused his death.  Finally, the County submits that it has been misjoined in this lawsuit and addresses the same below without waiving its rights to seek bifurcation and other evidentiary rulings addressing the serious prejudice of the Estate trying to commingle the claims, defendants

and injuries in such a way as to create confusion, passion and misdirection.  The Estate should not be allowed to lump together into one stewpot what is essentially a medical malpractice case against medical providers for an undiagnosed complicated medical situation with a singular claim of conditions against the jail about non-medical issues.

## **FACTUAL BACKGROUND**

### I.    **January 22, 2020 Suicide Attempt**

The Complaint acknowledges this case begins with Mr. Nottestad, who sustained a self-inflicted gunshot which, in turn, sent him to the hospital and, in turn, to the County Jail for violating his probation terms. (DPFOF ¶ 1). More specifically, on January 22, 2020 Jeffrey Nottestad unsuccessfully attempted to take his life by an intentional self-inflicted gunshot wound, for which he received emergency medical transport and services to Black River Memorial Hospital and then to Gunderson Hospital for further treatment.  (DPFOF ¶ 2).[1]  Jackson County Sheriff's Deputies completed a records check on Nottestad and found Nottestad had an active warrant for his arrest and was a convicted felon who was not allowed to be in possession of a firearm.  (DPFOF ¶ 3). Jackson County Sheriff's Deputies indicated the case would be forwarded with charges for violating Wisconsin Statute 941.29(1m) for possession of a firearm by convicted felon to the District Attorney's Office. (DPFOF ¶ 4).

### II.    **Gunderson Lutheran Hospital**

Nottestad was treated at Gunderson Lutheran from January 22 to January 31, 2020 and was also seen been by Behavioral Health staff at that time.  (DPFOF ¶ 5). During his stay, his records reflected that he had left sided paralysis due to a previous stroke he suffered approximately fifteen years earlier and had a history of amphetamine abuse, acute renal failure, hypertension, seizure

---

[1] All Gunderson medical records are marked as Exhibit 1 attached to the Affidavit of Logic, and are filed under seal.

disorder, hyperlipidemia and cerebral vascular accidents. (DPFOF ¶ 6). Nottestad was also diagnosed with major depressive disorder. (DPFOF ¶ 7).

By January 27, 2020 he reported he had no symptoms of nausea, chest pain, shortness of breath or abdominal pain and he appeared medically stable with a physical examination of his abdomen revealing it felt, "soft, non-tender; bowel sounds normal; no masses; no organomegaly." (DPFOF ¶ 8).  Gunderson Lutheran discharged Nottestad on January 31, 2020. (DPFOF ¶ 9).   He was then transferred to the La Crosse County Jail ("Jail") at the direction of his probation agent, Bree Lien, due to the aforementioned violations. (DPFOF ¶ 10).

Nottestad's Gunderson Lutheran discharge paperwork required "[p]atient must be on suicide precautions in jail" and to "check in with psychiatric provider/RN in jail." (DPFOF ¶ 11). The discharge instructions further required he be placed on suicide prevention precautions including "[c]continuous observer with direct visualization of patient, safe room set-up to limit access to methods" of suicide. (DPFOF ¶ 12).

### III.   Arrival at La Crosse County Jail.

#### a.   Jail Staff Schedules During Nottestad's Incarceration.

While Nottestad was incarcerated at the Jail, the following correctional officers (COs) worked and interacted with him after he was booked into the Jail on the following dates:

- January 31, 2020
    - CO Alyssa Bowe – 3 P.M. to 11 P.M.
    - CO Ryan Schlicht – 3 P.M. to 11 P.M.
    - CO Jessica Bautch – 11 P.M. to 3 A.M. on February 1, 2020
    - CO Joe Mathison – 11 P.M. to 7 A.M. on February 1, 2020
- February 1, 2020
    - CO Jessica Bautch – 11 P.M. on January 31, 2020 to 3 A.M.
    - CO Joe Mathison – 11 P.M. on January 31, 2020 to 7 A.M.
    - CO Kristie Marx – 3 A.M. to 7 A.M.
    - CO Frank Fogel – 7 A.M. to 3 P.M.
    - CO Steve Benusa – 7 A.M. to 3. P.M.

- o  CO Alyssa Bowe – 3 P.M. to 11 P.M.
- o  CO Ryan Schlicht – 3 P.M. to 11 P.M.
- o  CO Jessica Bautch – 11 P.M to 7 A.M. on February 2, 2020
- o  CO Doug Aylsworth – 11 P.M to 7 A.M. on February 2, 2020
- February 2, 2020
  - o  CO Jessica Bautch – 11 P.M. on February 1, 2020 to 7 A.M.
  - o  CO Doug Aylsworth – 11 P.M. on February 1, 2020 to 7 A.M.
  - o  CO William Wolf – 7 A.M. to 3 P.M.
  - o  CO Mike Devine – 7 A.M. to 3 P.M.
  - o  CO Shailee Quast – 3 P.M. to 3 A.M. on February 3, 2020
  - o  CO Jim Kohlmeier – 3 P.M. to 11 P.M.
  - o  CO Dave Siddons – 11 P.M. to 7 A.M. on February 3, 2020
- February 3, 2020
  - o  CO Mark Welander – 3 A.M. to 7 A.M.
  - o  CO Dave Siddons – 11 P.M. on February 2, 2020 to 7 A.M.
  - o  CO Shailee Quast – 3 P.M. on February 2, 2020 to 3 A.M.
  - o  CO Jackie Zimmerman – 7 A.M. to 3 P.M.
  - o  CO Frank Fogel – 7 A.M. to 3 P.M.
  - o  CO Marty Gunderson – 3 P.M. to 11 P.M.
  - o  CO Annie Corcoran – 3 P.M. to 11 P.M.
  - o  CO Tim Shelton – 11 P.M. to 7 A.M. on February 4, 2020
  - o  CO Ryan Rhead – 11 P.M. to 7 A.M. on February 4, 2020
- February 4, 2020
  - o  CO Tim Shelton – 11 P.M. on February 3, 2020 to 7 A.M.
  - o  CO Ryan Rhead – 11 P.M. on February 3, 2020 to 7 A.M.
  - o  CO Steve Simon – 7 A.M. to 3 P.M.
  - o  CO William Wolf  - 7 A.M. to 3 P.M.

(DPFOF ¶ 13).

While Nottestad was incarcerated at the Jail, the following nursing staff worked and interacted with him after he was booked into the Jail on the following dates:

- January 31, 2020
  - o  Danielle Tillman – 4 P.M. to 10 P.M.
  - o  Julie McCormick – 10 P.M. to 6:30 A.M. on February 1, 2020
- February 1, 2020
  - o  Julie McCormick – 10 P.M. on January 31, 2020 to 6:30 A.M.
  - o  Danielle Tillman – 6 A.M. to 12 P.M.
  - o  Kari Salter – 12 P.M. to 10 P.M.

- o Julie McCormick – 10 P.M. to 10:30 A.M. on February 2, 2020
- February 2, 2020
  - o Julie McCormick – 10 P.M. on February 1, 2020 to 10:30 A.M.
  - o Amber Fennigkoh – 10 A.M. to 10:30 P.M.
- February 3, 2020
  - o Makayla Miller (Stackhouse) – 5 A.M. to 1:30 P.M.
  - o Kari Salter – 7 A.M. to 3:30 P.M.
  - o Julie McCormick – 3:30 P.M. to 12 A.M on February 4, 2020
- February 4, 2020
  - o Makayla Miller (Stackhouse) – 5 A.M. to 1:30 P.M.
  - o Kari Salter – 6:45 A.M. to 6 P.M.

(DPFOF ¶ 14).

### b. Intake and Booking at the Jail.

Nottestad arrived at the Jail on January 31, 2020 after an Order to Detain had been issued by the Wisconsin Department of Corrections for "Possession of a Firearm or Weapon; Felon or DV Offender." (DPFOF ¶ 15).

Nottestad was booked into the Jail at 5:18 P.M., and he admitted he previously attempted suicide that resulted in hospitalization. (DPFOF ¶ 16). As such, and per Gunderson Lutheran's discharge instructions, the Jail placed Nottestad on a fifteen-minute watch schedule to ensure his safety and to monitor and prevent self-harm. (V DPFOF ¶ 17). During his booking, a mental health referral was completed and a supervisor at the Jail was notified. (DPFOF ¶ 18).

Jail nursing staff evaluated Nottestad at the Jail at 5:20 P.M. while being booked. DPFOF ¶ 19). Nottestad indicated he had suffered a stroke which left the left side of his body paralyzed and that he used a left leg brace and cane for mobility purposes. (DPFOF ¶ 20). The Jail doctor was called to discuss Nottestad's medication and treatment within the Jail. (DPFOF ¶ 21). A nurse entered a daily progress that Nottestad could use a cane and leg brace once cleared from suicide watch by the mental health team and should then be moved to a medical cell. (DPFOF ¶

22).  This information about the cane and leg brace was not conveyed from the medical staff to the Jail staff, nor are such nursing progress records accessible to non-medical personnel like the Cos. (DPFOF ¶ 23).

After he was booked, Nottestad was placed in Medical Cell 3 on a fifteen-minute interval suicide watch on January 31, 2020 at approximately 5:43 P.M.  (DPFOF ¶ 24).  Medical Cell 3 has a padded floor and walls, and a mattress pad is placed on the floor for inmates to lay on. (DPFOF ¶ 25). The cell also has a toilet grate on the floor of the cell which covers a drain that inmates may use to urinate or defecate, and which can be flushed from the outside by Jail staff. (DPFOF ¶ 26).  The cell Nottestad was housed in did not have a toilet, sink, or bunk and he was provided with a mattress pad, tear resistant blanket and tear resistant smock while in the cell. (DPFOF ¶ 27).  Medical Cell 3 is used for inmates, such as Nottestad, who presented a risk of self-harm or suicide, because such cell is designed with minimal fixtures or furnishings by which inmates can use to harm themselves and, for the same reasons, no equipment, devices or other objects are provided to the inmates by which they can commit self-harm. (DPFOF ¶ 28).

### c. Nottestad's Housing in Medical Cell 3 on January 31, 2020.

Nottestad was housed in Medical Cell 3 from approximately 5:43 P.M. on January 31, 2020 until approximately 8:10 A.M. on February 3, 2020. (DPFOF ¶ 29).  During that time entries were made in the special watch log for Nottestad at fifteen-minute intervals and had 288 individual entries and observations made in the special watch log for that period of time.  (DPFOF ¶ 30). Each entry on the special watch log represents an instance in which a Jail CO observed Nottestad and recorded their observations. (DPFOF ¶ 31).

At 7:20 P.M. nursing staff entered Nottestad's cell to give him medication and water. (DPFOF ¶ 32).

Due to Nottestad's physical condition and mobility issues, CO Ryan Schlicht offered Nottestad to use a different cell with a regular toilet to use the restroom. (Logic Aff. Exh. 16, DPFOF ¶ 33). Nottestad told CO Schlicht to "fuck off" and declined the offer. (DPFOF ¶ 34).

While some COs noted Nottestad seemed stiff or walked with a limp, others observed and also noted no complications associated with Nottestad's ability to move around, access his meals or relieve bodily fluids while in the Medical Cell. (DPFOF ¶ 35).

Similarly, depending on the day and time, while certain COs noted that Nottestad complained or made requests to them about having pain or wanting medication or to see the nurse (and in each instance they apprised a nurse as reflected by the nurses' various visits and medication runs), others noted Nottestad made no such complaints or requests during their shift and he did not seem to be in any medical distress. (DPFOF ¶ 36).

Nottestad urinated for the first time in Medical Cell 3 on January 31st at 8:02 P.M. (DPFOF ¶ 37). He did so by dumping out the contents of the water cup in his cell and urinated directly into the water cup while remaining seated on the mattress pad; he then set the cup on the floor and laid back down. (DPFOF ¶ 38). Jail staff asked Nottestad at 9:30 P.M. if he would like a new cup of water, but Nottestad declined. (DPFOF ¶ 39).

### d. Nottestad's Housing in Medical Cell 3 on February 1, 2020.

At 1:42 A.M. on February 1st Nottestad dumped the urine from his water cup toward the toilet grate in the floor, again urinated into the cup and then proceeded to dump the contents of the cup toward the toilet grate. (DPFOF ¶ 40).

At 2:30 A.M., Jail staff offered him water, he declined, and Jail staff then told him not to drink out of the cup he urinated in; instead, Jail staff provided him a new water cup. (DPFOF ¶ 41).

At 5:46 A.M. on February 1st Nottestad again urinated into the water cup while seated on the mattress pad and set the full cup on the floor. (DPFOF ¶ 42). CO Joe Mathison entered Nottestad's cell at 5:56 A.M. and hand delivered a new cup of water to Nottestad, and removed the old cup from the cell after conversing with Nottestad. (DPFOF ¶ 43). Nottestad was asked why he urinated in the cup but told Jail staff "fuck you." (DPFOF ¶ 44).

CO Mathison returned to Nottestad's cell at 6:16 A.M. on February 1st and cleaned the cell with a mop and bucket. (DPFOF ¶ 45). The cell was cleaned after it was determined it was safe to do so. (DPFOF ¶ 46). Mathison also gave Nottestad a new blanket to use and moved the mattress pad closer to the toilet grate in the floor for easier accessibility for Nottestad. (DPFOF ¶ 47).

Following the cleaning of Nottestad's cell, CO Mathison informed Sergeant Gregg Hoesley about Nottestad's condition and what could be done to make him more comfortable. (DPFOF ¶ 48). That same night, Nottestad also asked Jail staff for pain medication and Jail staff informed nursing staff of the request. (DPFOF ¶ 49).

Nottestad repositioned himself at 6:26 AM and appeared to urinate directly into the floor toilet grate in the cell. (DPFOF ¶ 50).

Nottestad asked for pain medication from Jail staff at 6:43 A.M. (DPFOF ¶ 51). CO Mathison notified nursing staff of his request. (DPFOF ¶ 52). He then informed Jail staff that he needed to defecate and staff provided him with toilet paper. (DPFOF ¶ 53).

At 8:38 A.M. Nottestad repositioned himself near the toilet grate to urinate and, for the first time since entering the cell, defecated. (DPFOF ¶ 54). Nottestad did not use the toilet paper that was made available to him; nor did he call for any Jail staff to clean or flush the toilet grate. (DPFOF ¶ 55).

CO Frank Fogel entered Nottestad's cell at 11:17 A.M., less than three hours since Nottestad defecated, saw the feces and pushed it down the toilet grate. (DPFOF ¶ 56).

Nottestad again urinated at 2:47 PM by positioning himself off the mattress pad while lying on the floor so that he could urinate in the general direction of the drain. (DPFOF ¶ 57).

CO Alyssa Bowe asked Nottestad if he needed anything or needed some water on February 1st at 3:40 P.M. (DPFOF ¶ 58). Nottestad declined the offer. (DPFOF ¶ 59).

Nottestad was again offered assistance to use the restroom in a cell with a standard toilet by CO Schlicht at 5:05 P.M. on February 1st, but he again refused. (DPFOF ¶ 60). COs Schlicht and Bowe both noted Nottestad was rude when refusing the offer and was disgruntled about his placement in the Medical Cell. (DPFOF ¶ 61). Nottestad was provided dinner and threw some of the remnants of the food toward the grate. (DPFOF ¶ 62).[2]

Nursing staff entered Nottestad's cell at 7:01 P.M. to administer medication to Nottestad and provide him with water. (DPFOF ¶ 63).

At 8:48 P.M. Nottestad again positioned himself lying on his mattress pad facing the grate in the floor and urinated in its direction. (DPFOF ¶ 64). He then took one of his cups of water and emptied its contents in the direction of the toilet grate in order to flush any urine into the grate. (DPFOF ¶ 65).

### e. Nottestad's Housing in Medical Cell 3 on February 2, 2020.

Nottestad remained housed in Medical Cell 3 on February 2, 2020 and at 2:34 A.M. he grabbed the toilet paper that was left for him on the cell's food slot, stood up and leaned against the cell as he urinated into the floor grate. (DPFOF ¶ 66.).

---

[2] Other jailers during their shifts also found him to be discontent with his detention back in jail, despite their efforts to check on him or see to his needs. (Logic Aff. Exh. 13, Bautch Depo. at p. 12:5-12; Logic Aff. Exh. 11, Benusa Depo. at p. 13:11-25; Logic Aff. Exh. 8, Siddons Depo. at pp. 9:23 – 10:1; Logic Aff. Exh. 10, Mathison Depo. at pp. 16:23 – 17:12)

At 3:15 A.M. Nottestad complained about being housed in the Medical Cell and Jail staff informed him that once Nottestad was cleared from the fifteen-minute special watch protocol he would be moved to a different cell. (DPFOF ¶ 67).

At 3:56 A.M. Nottestad was again provided with toilet paper. (DPFOF ¶ 68.).   At 4:11 A.M. Nottestad told Jail Staff he wanted to go to the hospital and was advised nursing staff was coming to give him his pain medications. (DPFOF ¶ 69).   Between 4 and 5 A.M. Nottestad repeatedly stood and moved around his cell on his own accord and power.  (DPFOF ¶ 70).

At 5:11 A.M. Nottestad received medications.   (DPFOF ¶ 71).   Shortly thereafter he requested to see the nursing staff again. (DPFOF ¶ 72).

Nottestad once again stood and leaned against the cell wall and appeared to urinate at 8:54 A.M. (DPFOF ¶ 73).

At 11:20 A.M. Nottestad asked to sit in a wheelchair but was advised it was not possible to provide him with one in that cell. (DPFOF ¶ 74).   Shortly thereafter he reported he slipped and fell and broke his hip around 11:34 A.M. (DPFOF ¶ 75).   Jail staff reviewed the video of Nottestad's cell with Nurse Fennigkoh, who determined Nottestad was moving about in a way that revealed he did not have a broken hip. (DPFOF ¶ 76).

At approximately 12:17 P.M. Nottestad defecated while lying partially on the mattress pad. (DPFOF ¶ 77).   He used a piece of toilet paper to pick up the feces and set the toilet paper near the floor grate. (DPFOF ¶ 78).   At 12:24 P.M. he appeared to move the toilet paper onto the top of the grate such that the feces fell through the toilet grate into the water below. (DPFOF ¶  79).   After this point, no feces can be seen from the cell camera.  (DPFOF ¶ 80).   At 12:33 P.M. Nottestad pushed the remaining piece of toilet paper into the grate. (DPFOF ¶ 81).

Nottestad called for "help" around 12:42 P.M., staff notified the nurses and Nurse Fennigkoh responded to him and provided him with his medication (DPFOF ¶ 82).

During the remainder of February 2nd, Nottestad urinated at 4:31, 6:27 and 10:22 P.M. and each time he did so, he laid on his mattress pad and positioned his body facing the toilet grate, urinating in its direction. (DPFOF ¶ 83).

### f.   Nottestad's Housing in Medical Cell 3 on February 3, 2020.

Beginning at 12:38 A.M. on February 3rd, Nottestad defecated several times over the next several hours and would toss or throw the feces toward the grate in the floor. (DPFOF ¶ 84). However, he did not inform staff to have the toilet grate flushed or cell cleaned because he defecated. (DPFOF ¶ 85). Instead, at 12:58 A.M. Nottestad asked for water and complained about back pain. (DPFOF ¶ 86). Later, when Jail staff handed Nottestad a cup of water at 3:38 A.M., he again did not complain or request to clean the feces in the cell. (DPFOF ¶ 87). COs Dave Siddons and Mark Welander entered Nottestad's cell at 6:43 A.M. when they saw the feces, felt it was safe to go in and cleaned the cell. (DPFOF ¶ 88).

At 6:30 A.M. Nottestad was provided with medication by nursing staff. (DPFOF ¶ 89). When the nurse did so, Nottestad did not complain about feeling sick, having a loss of appetite or being in pain at this time. (DPFOF ¶ 90).

At 8:08 A.M. on February 3rd, Jail staff provided Nottestad a standard Jail uniform and then transported him via wheelchair to an interview room for a mental health assessment with Clinical Therapist Carrie Bailey, who typically considers removing inmates from special watches after 9 A.M. (DPFOF ¶ 91).

Following the interview with Ms. Bailey, she cleared Nottestad from special watch after he acknowledged he no longer wanted to die; she directed he be placed in a regular receiving cell.

(DPFOF ¶ 92).  At that time, Nottestad did not complain of any physical pain or physical issues to Ms. Bailey.  (DPFOF ¶ 93).

### g.   Nottestad's Housing in Receiving Cell 13 on February 3, 2020.

At 8:21 A.M. Nottestad was transported from the interview room to Receiving Cell 13. (DPFOF ¶ 94).

Receiving Cell 13 is a standard cell within the Jail which has an elevated slab with a mattress pad laid on top of it and a toilet and sink in the corner of the cell.  (DPFOF ¶ 95).

CO Frank Fogel replaced Nottestad's mattress pad when he was transferred to Receiving Cell 13 immediately after discovering there may have been urine on the mattress pad. (DPFOF ¶ 96).  Nottestad never complained about soiling his mattress pad nor requested a new mattress pad and, with exception for Cos Mathison and Fogel who replaced a blanket and mattress pad out of an abundance of caution, most Jail and nursing staff did not observe Nottestad with a soiled mattress pad, soiled clothing or lying in or near urine or feces at any point of his detention. (DPFOF ¶ 97).

Nottestad was able to stand and maneuver around Receiving Cell 13 to use the toilet and sink without assistance. (DPFOF ¶ 98).

At 1:07 P.M. nursing staff entered Nottestad's cell and provided him with medications. (DPFOF ¶ 99).

At 3:58 P.M., Cos moved Nottestad via wheelchair to speak with probation agent Mark Fries. (DPFOF ¶ 100).  During the meeting, Nottestad did not make any requests or complaints to Mr. Fries. (DPFOF ¶ 101).

Nurse McCormick entered Nottestad's cell at 8:56 P.M. (DPFOF ¶ 102).  Nottestad complained of sciatic nerve pain in his hip, nausea and lack of appetite. (DPFOF ¶ 103).  Nursing

staff asked what could be done to support Nottestad and he requested an additional mattress pad, to which Jail staff supplied an additional blanket for padding. (DPFOF ¶ 104).  Nottestad had not been eating much, which was documented by Jail staff and reviewed by Nurse McCormick. (DPFOF ¶ 105).  Nursing staff called and advised the Jail physician of the situation, who authorized Nottestad to take Zofran for the nausea, which was provided to Nottestad.  (DPFOF ¶ 106).  Nursing staff also had Nottestad sign a medical release so more information could be gathered on his medical history. (DPFOF ¶ 107).  Nurse McCormick also examined and treated abrasions on Nottestad's legs and face at this time. (DPFOF ¶ 108).  Nurse McCormick discussed with Nurse Salter, her boss, about how to manage Nottestad's medical care. (DPFOF ¶ 109).

At 9:12 P.M. CO Marty Gunderson entered Nottestad's cell and provided him with an additional blanket after Nottestad complained of sciatic pain down his right hip. (DPFOF ¶ 110). Nottestad also complained about face and back pain and requested a heating pad. (DPFOF ¶ 111). CO Jessica Bautch forwarded this complaint and request to nursing staff, who spoke with Nottestad regarding the same. (DPFOF ¶ 112).  Nursing staff entered his cell, checked on Nottestad again at 9:38 P.M. and provided him with medication. (DPFOF ¶ 113.).

### h.  Nottestad's Housing in Receiving Cell 13 on February 4, 2020.

While still in Receiving Cell 13 during the early morning hours of February 4, 2020, Nottestad can be seen still using the toilet and sink by himself as needed. (DPFOF ¶ 114).

At 12:47 A.M. Jail staff entered Nottestad's cell and refilled his water cup for him. (DPFOF ¶ 115).

At 1:01 A.M. Nottestad lowered himself from the platform for the mattress pad onto the floor and laid on the floor. (DPFOF ¶ 116).  Jail staff assisted Nottestad onto the toilet in the cell at 1:02 A.M. (DPFOF ¶ 117).  At 1:04 A.M. the Cos return to the cell and help transfer Nottestad

back to his mattress pad. (DPFOF ¶ 118).  The COs also took Nottestad to the toilet at 1:15 A.M. and returned him to the mattress pad at 1:20 A.M. (DPFOF ¶ 119).

At 1:23 A.M. Nottestad poured water from his water cup onto is head, which then pooled on the floor in his cell. (DPFOF ¶ 120).  Jail staff entered Nottestad's cell at 1:51 A.M. and refilled Nottestad's water cup. (DPFOF ¶ 121).  This process was repeated at 4:52 A.M. (DPFOF ¶ 122). During that sequence of events with the COs, Nottestad complained about pain in his side, and they informed nursing staff of this complaint at approximately 5 A.M. (DPFOF ¶ 123).

Nurse Salter entered Nottestad's cell at 6:38 A.M. and provided him with medication. (DPFOF ¶ 124).

Nottestad complained to Jail staff his feet turned black and he needed help at 8:30 A.M. (DPFOF ¶ 125).  Jail staff informed nursing staff of this complaint. (DPFOF ¶ 126).

At 8:46 A.M. Nurse Miller entered Nottestad's cell, examined his feet and checked his vitals. (DPFOF ¶ 127). Nottestad complained his feet were turning black and that he had pain in his right calf and groin.  (DPFOF ¶  128).  The nurse checked his vital signs (finding elevated blood pressure of 160 systolic/100 diastolic) but found no issues with Nottestad's groin or other vital signs; she examined Nottestad's feet and legs (noting some toes were cold to the touch) and found he had a pedal pulse (meaning that pulses could be felt in his feet) and had a longer than normal "capillary refill time" (meaning that the circulation of his blood was slower than typical). (DPFOF ¶ 129).  Nurse Miller did not contact the physician for the Jail because she did not believe there was a need or an emergency that warranted such contact. (DPFOF ¶ 130).  Determinations of emergency situations are within the nursing staff's judgment.  (DPFOF ¶ 131).

Following his assessment by Nurse Miller, Jail staff asked Nottestad if he would like to be transferred to a cell that would reduce the distance between his bed and the toilet, and Nottestad

agreed to this course of action. (DPFOF ¶ 132).  At 9:15 A.M. on February 4th, Jail staff transferred Nottestad via wheelchair from Receiving Cell 13 to Receiving Cell 14. (DPFOF ¶ 133).

### i.   Nottestad's Housing in Receiving Cell 14 on February 4, 2020.

Nottestad was housed in Receiving Cell 14 starting at 9:16 A.M. (DPFOF ¶ 134).  The conditions and features of Receiving Cell 14 were identical to Receiving Cell 13, with the exception of the toilet and sink being located on the opposite side of the cell. (DPFOF ¶ 135).

At 9:40 A.M. Nurse Miller and Nurse Salter staff examined Nottestad in order to follow-up on his previous complaints and for Nurse Miller to get a second opinion from Nurse Salter. (DPFOF ¶ 136).  Nottestad again complained of pain in his feet and also in his groin from a hernia, which they found did not appear red or inflamed. (DPFOF ¶ 137).  No changes were noted from the previous examination at 8:45 A.M. and the nurses decided to continue to monitor Nottestad. (DPFOF ¶ 138).

Based on her assessment, Nurse Miller did not believe Nottestad needed to go to the hospital. (DPFOF ¶ 139).  Nurse Salter agreed Nottestad's condition and symptoms were not an immediate emergency. (DPFOF ¶ 140).  Sepsis was not considered as a cause, as sepsis has symptoms of increased temperature, lack of appetite, pain, drainage and lack of energy, which they did not believe he exhibited during their assessment. (DPFOF ¶ 141).

At approximately 10:12 A.M. CO Steve Simon checked on Nottestad and noted that he was sitting on his bunk. (DPFOF ¶ 142). At this time, Sergeant Hoesley began the process of getting approval for Nottestad to use a cane in his cell. (DPFOF ¶ 143).  CO Thad Flaherty also informed Nottestad that he would inquire about the ability of Nottestad to use a walker in his cell and passed this proposal to the nursing staff.  (DPFOF ¶ 144).  Even preceding those activities, Jail Captain Verse had come in Monday morning February 3rd , learned of Mr. Nottestad's

detention that weekend, and had already arranged for the weekly meeting between administration and nursing staff to take place the next morning on February 4th at 10:45 A.M., at which time they would have discussed Nottestad's medical situation and whether Nottestad could safely use a cane or leg brace. (DPFOF ¶ 145).

At 10:34 A.M., Jail staff entered Nottestad's cell and found him to be unresponsive. (DPFOF ¶ 146). Jail staff responded to the scene and began CPR. (DPFOF ¶ 147). Emergency medical responders entered the cell at 10:42 A.M. and took over lifesaving efforts on Nottestad. (DPFOF ¶ 148).

## IV.    MAYO CLINIC AUTOPSY AND CAUSE OF DEATH.

Nottestad's body was transported to the Mayo Clinic for autopsy. (DPFOF ¶ 149). The final anatomic diagnosis noted several observations, including: multiple transmural duodenal ulcers perforating through the duodenum and into peripancreatic fat; atherosclerotic and hypertensive cardiovascular disease; pulmonary congestion, mild emphysematous changes and patchy hemoaspiration; right pleural serosanguineous effusion with posterior adhesions; mitral valve chordae tendinea fusion; left posterior focal subscapular hemorrhages; history of remote middle cerebral artery distribution infarct; and resuscitation injuries. (DPFOF ¶ 150). Ultimately, Dr. Ross Reichard concluded that Nottestad died "as a result of complications of bowel perforating duodenal ulcers. The manner of death is classified as natural." (DPFOF ¶ 151).

## <u>STANDARD OF REVIEW</u>

Summary judgment is proper if the pleadings, depositions, interrogatories, and admissions on file, together with any affidavits, establish that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The burden is on the moving party to demonstrate the absence of a genuine issue of material fact and

that judgment as a matter of law should be granted.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that is outcome determinative of an issue with substantive law identifying which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once this burden is met, the opposing party must go beyond the pleadings and designate the specific facts showing there is a genuine issue.  *Anderson*, 477 U.S. at 248.  The mere existence of some alleged factual disputes will not defeat an otherwise properly supported motion for summary judgment.  *Id*.  Nor will speculation, hearsay or conclusory allegations defeat summary judgment. *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999).

## ANALYSIS

### I.   THE SOLE CAUSE OF ACTION AGAINST LA CROSSE COUNTY FOR CONDITIONS OF CONFINEMENT DOES NOT SUCCEED UNDER THE ELEMENTS OF *MONELL*.

Municipal liability "is difficult to establish." *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020). This is because a municipality is not vicariously liable for the constitutional torts of its employees. See *Monell v. Department of Social Services*, 436 U.S. 658, 691-94 (1978). A plaintiff asserting a § 1983 claim against a municipality under *Monell* must prove the constitutional violation is attributable to the municipality itself such that it was caused by a governmental "policy of custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy. *Id*. at 690-91.

Recently, in *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago,* 988 F.3d 978 (7th Cir. 2021) the Seventh Circuit reiterated the requirement that plaintiffs must prove the underlying constitutional liability, the *Monell* requirements, and causation. *Id*. at 990.  In

distinguishing between *Monell* theory and an underlying theory of constitutional liability - in that

case, liability under *DeShaney* - the Seventh Circuit explained:

> *Monell* interpreted § 1983 and addressed the issue of who can be sued under the statute; the Court
> held that a municipality is a "person" under § 1983 and may be liable – just like an individual public
> official – for its own violations of federal rights. *Monell* did not address the substance of any right
> under the federal Constitution or laws. It has nothing to say on that subject. It's a statutory-
> interpretation decision.

*Id*. at 990.

Thus, the court reiterated that a plaintiff bringing a claim for municipal liability "ha[s] the

burden to prove a constitutional violation in addition to the requirements of municipal liability

under *Monell*." *Id*.

In addition to these two requirements, the court stated, a plaintiff must also prove that "the

municipality's action was the moving force behind the federal –rights violation. *Id*. at 987. *Monell*

requires a "rigorous causation standard" such that a plaintiff must show a "direct causal link"

between the municipal action and the violation of constitutional rights. *Id*.

The order of proof is as such: "A *Monell* plaintiff must establish that he suffered a

deprivation of a federal right before municipal fault, deliberate indifference, and causation come

into play." *Id*.

## A.  An Eighth Amendment Constitutional Violation did not Occur in This Case

The Complaint's cause of action against La Crosse County is an Eighth Amendment "Cruel

and Unusual Punishment" claim that is styled as being "Official Capacity" and goes on to allege

the policies and procedures of La Crosse County violated Nottestad's right "to be free from cruel

and unusual punishment, i.e., to be free from punishment that deprived him of his dignity and

subjected him to humiliation for no lawful purpose." (Dkt. #1 at p. 7, ¶¶40-41).  This violation

occurred because "Nottestad was forced to crawl around in his cell like an animal, and lie in his

urine and next to his feces for hours at a time, pursuant to policies, procedures and practices in place at the La Crosse County Jail."  (*Id*. ¶ 39).

To prevail on a claim under the Eighth Amendment, Plaintiff is required to show: (1) the deprivation suffered must be objectively, sufficiently serious, and (2) the defendants were subjectively, deliberately indifferent to that serious deprivation. *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001); *Thomas v. Blackard*, 2 F.4th 716, 719-720 (7th Cir. 2021). Jail officials violate the Eighth Amendment if they are deliberately indifferent to adverse conditions that deny "the minimal civilized measure of life's necessities" which includes adequate sanitation. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Williams v. Shah*, 927 F.3d 476, 480 (7th Cir. 2019).  "[T]o prove a violation of the Eighth Amendment, a prisoner must go beyond allegations and produce evidence not only of the inhumane conditions, but also that officials were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas* 2 F.4th at 720.

In *Thomas*, an inmate made Eighth Amendment Conditions of Confinement claims alleging he as housed in a cell that had feces and urine smeared on across the cell, human waste smeared on his mattress, had hundreds of dead flies and inadequate plumbing for two months and that correctional staff did nothing after he filed complaints regarding the same. *Id*. at 718.  The Seventh Circuit affirmed dismissal of the claims because there, as here, correctional staff responded to and mitigated the inmate's complaints within two weeks (here, much sooner), such that no reasonable jury could have found correctional staff to have acted with deliberate indifference to the complaints and conditions required to satisfy the second, subjective prong. *Id*. at 721; *see also Vinning-El v. Long*, 482 F.3d 923, 924-925 (7th Cir. 2007) (noting six days of living in a cell with feces and blood smeared on the wall when correctional staff did nothing to

remedy situation was enough to raise a material dispute of fact on summary judgment as to whether correctional staff would have satisfied subjective prong of Eighth Amendment conditions of confinement claim); *Johnson v. Pelker,* 891 F.2d 136, 139 (7th Cir. 1989) (suggesting that ignoring an inmate's request for cleaning supplies to clean feces smeared in their cell for three days may violate the Eighth Amendment); *Lindell v. Pollard*, 558 F. Supp. 3d 734, 751-752 (E.D. Wis. 2021) (where an inmate's cell was not covered from floor-to-ceiling and only small amounts of feces were present and physical exposure was minimal, while unpleasant, conditions were not sufficient for Eighth Amendment claim when the cell was cleaned within 24 hours).

Here, Nottestad was not subjected to day's long exposure to feces and urine in Medical Cell 3, let alone was he denied any relief.  Rather, COs entered Nottestad's cell on several different occasion while was housed in Medical Cell 3, upon learning or seeing the feces or soiling, and tended to it, plus they constantly gave him other attention like medical, water and food.  Although unpleasant in hindsight and out-of-context, he was never exposed to or lied in feces directly (he flung it away from his body and mattress) and any feces in the cell never sat longer than five hours, all occurring in a suicide cell where the CO's duty and attention focused on preventing self-harm, which obviously requires allowing him at times to be left undisturbed, unagitated and sleeping. The COs at the Jail cleaned Nottestad's after they became aware of the presence of excrement. (DPFOF ¶ 46). Further, upon his release from the suicide cell he was moved to a cell where the Estate itself acknowledges there were no instances of undignified conditions; but, even before that move, on more than one occasion COs offered Nottestad the option to use a toilet located in a different cell, which he declined. (DPFOF ¶¶ 33-34).  Nottestad was also provided replacement blanket and mattress pads by Jail staff, showing attentiveness to his cleanliness and that of the cell. These actions of Jail staff were also proactive since Nottestad did not request his toilet grate be

flushed or his cell be cleaned of the fecal matter he had flung. Nor did he make comment to the COs or nursing staff regarding the presence of urine or feces in Medical Cell 3. His requests were for medical care, whether medications or otherwise. A jury could not reasonably find that they were subjectively aware of the conditions and refused to take action regarding them, as required to satisfy an Eight Amendment conditions of confinement claim. *Thomas* 2 F.4th at 720.

**B. Plaintiff Cannot Establish Municipal Fault on the County**

Even if there was a constitutional violation, the Estate has neither pled sufficient allegations nor can it show sufficient evidence to build the other features of a *Monell* claim. In *Dean v. Wexford Health Sources, Inc*., the Seventh Circuit succinctly identified the elements of a *Monell* claim:

> To begin, a § 1983 plaintiff must always show that he was deprived of a federal right. Beyond that, the plaintiff must trace the deprivation to some municipal action (i.e., a "policy or custom"), such that the challenged conduct is properly attributable to the municipality itself. There are at least three types of municipal action that may give rise to municipal liability under § 1983: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. Inaction, too, can give rise to liability in some instances if it reflects a conscious decision not to take action. Next, the plaintiff must show that the policy or custom demonstrates municipal fault, i.e. deliberate indifference. This is a high bar. If a municipality's action is not facially unconstitutional, the plaintiff must prove that it was so obvious that the municipality's action would lead ot constitutional violations and that the municipality consciously disregarded those consequences. Finally, the plaintiff must show that the municipal action was the moving force behind the federal-rights violation. This rigorous causation standard requires a direct causal link between the challenged municipal action and the violation of constitutional rights.

18 F.4th 214, 235 (7th Cir. 2021) (citations and quotes omitted).

Thus, three theories of liability may give rise to municipal fault under *Monell*: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation

that the constitutional injury was caused by a person with final policy making authority. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021).

Here, however, Plaintiff cannot prove municipal fault under the first or second of the *Monell* theories of liability.[3]

<u>First</u>, Plaintiff has neither pled nor can he show any official unconstitutional policy. Bare allegations of an unconstitutional policy cannot give rise to *Monell* liability: "[l]ocating a policy ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997). *See also Glisson v. Indiana Dep't of Corrs*., 849 F.3d 372, 381 (7th Cir. 2017) ("The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?").

The Seventh Circuit recently reemphasized the importance of identifying a specific policy in *Gonzalez v. McHenry County*, Il, 40 F.4th 824 (7th Cir. 2022). There, a plaintiff, the estate of a pretrial detainee who had suffered from serious medical conditions, argued that the sheriff's "policy" of accepting any pretrial detainee in the jail without regard to the jail's ability accommodate his serious medical condition violated his constitutional rights. The plaintiff believed this "policy" caused the detainee pain and death. The Seventh Circuit, however, disagreed. The court held, in part, that the plaintiff had not pointed to a policy at all, pointing out the sheriff was compelled by Illinois law to accept inmates. *Id*. at 829. Thus, the municipal liability claim was dismissed.

---

[3] Plaintiff has not pled municipal liability under a final policymaker theory. The Complaint expressly references "policy" or "practices and procedures." (Dkt. 1 ¶ 40.) Nor has he identified any policymaker or explained how such individual qualifies as a policymaker under *Monell* theory or what actions that individual took that caused a constitutional deprivation.

Here, the Estate's Complaint alleges only that "La Crosse County knew that its policies, practices and procedures would violate Nottestad's rights under the Eighth and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishment, i.e. to be free from punishment that deprived him of his dignity and subjected him to humiliation for no lawful purpose. (Dkt. 1 ¶ 40.)  The Complaint alleges La Crosse County had policies that forced him "to crawl around in his cell like an animal, and lie in his urine and next to his feces for hours at a time." (Dkt. 1 ¶ 39.)

But beyond the conclusory statements in the Complaint, the Estate has not identified any La Crosse County policy that measures up to those allegations and that is unconstitutional. Plaintiff has not identified any La Crosse County policy that forced him to crawl around his cell and lie near his urine or feces for hours. Indeed, no such policy exists because the undisputed facts show that is not the case at all. Thus, any claim under *Monell* on a theory of an unconstitutional policy of La Crosse County's must fail.

Second, the Estate has not pled, nor can it establish, a widespread custom or practice claim. To demonstrate that a municipality "is liable for a harmful custom or practice, the plaintiff must show that [municipal] policymakers were deliberately indifferent as to the known or obvious consequences." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir 2010). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id*. Under this stringent standard, "it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). Rather, "what is needed is evidence that there is a true municipal policy at issue, not a random event." *Id*.

While there is no specific rule defining a widespread custom or practice, "it is clear that a single incident – or even three incidents – do not suffice. *See Wilson v. Cook County*, 742 F.3d 755, 780 (7th Cir. 2014). Moreover, the other identifiable incidents must be sufficiently similar to support municipal liability. *Id*; *see e.g. Foy v. City of Chicago*, 2016 WL 2770880 (N.D. Ill., May 12, 2016) (holding that plaintiff's citation to other deaths at police station did not share substantive similarities: "conclusory reliance on other deaths from 2007 and 2015 at the Harrison Police Station does not establish the possibility that the City's alleged widespread practices are so well-settled that they amount to an unconstitutional custom of policy); *see also Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005) (concluding that there was nothing to indicate a violation of a jail policy and that three alleged incidents did not amount to a widespread practice that was so well-settled so as to constitute an unconstitutional custom.).

Deliberate indifference is a high bar, one that the Estate fails to meet here. There is no evidence in the record to suggest conditions of confinement constitutional deprivations so widespread so as to constitute deliberate indifference.  The Complaint makes no reference of any similar incident that could be in any similar to this case, let alone one that meets these *Monell* standards.  There are no allegations, nor is there any evidence, of constitutional mishandling of conditions, accommodations or the like.  The Plaintiff's entire case is predicated solely on Mr. Nottestad's conditions over a course of days, primarily those in the suicide-watch cell.  Even assuming the Estate's theory is that the jail maintained a policy to safeguard inmates on suicide watch in a cell without a toilet or without a cane or walker accommodation, it is still the case there is no evidence of similar situations as posed by Mr. Nottestad, of a widespread practice of causing harm or injury, of any kind of notice to the Jail that such condition offended the constitution or even any state administrative standard, of officials being on notice and turning a blind eye.

**II.    PLAINTIFF'S CLAIM AGAINST THE COUNTY MUST BE DISMISSED BECAUSE THERE IS NEITHER A CAUSAL LINK NOR EXPERT OPINION TO SUPPORT A CAUSAL LINK BETWEEN THE CONDITIONS IN NOTTESTAD'S CELL AND HIS DEATH.**

Nottestad died of natural, and complicated, causes and the Estate has not produced any expert who can offer any opinion about a causal connection between the alleged conditions of confinement and his death.  The Mayo autopsy report concluded that Nottestad "died as a result of complication of bowel perforating duodenal ulcers. <u>The manner of death is classified as natural</u>." More specifically, it was listed as "[m]ultiple transmural duodenal ulcers perforating through the duodenum and into the peripancreatic fat with stool present throughout the peritoneum and gastrointestinal hemorrhage with tarry stool present through the small and large bowel."  By January 27, 2020, approximately three days before his incarceration, Nottestad's medical treatment upon discharge from Gunderson revealed he was medically stable with a physical examination of his abdomen revealing it felt, "soft, non-tender; bowel sounds normal; no masses; no organomegaly."  Nothing in the discharge or nursing evaluation put any medical professional on notice—and certainly not medically uneducated jailers—that his conditions of confinement could cause or exacerbate multiple transmural duodenal ulcers.  Further, Nottestad's medical records reflected that he had left-sided paralysis due to a previous stroke he suffered approximately fifteen years earlier and had a history of amphetamine abuse, acute renal failure, hypertension, seizure disorder and cerebral vascular accidents.

The causation here is even more tenuous because the complained-of conditions exclusively involve the period of time *while he was in the suicide cell*, not while he was in Receiving Cells 13 and 14 (standard jail cells) for over 24-hours before his death.

Plaintiff offers no evidence whatsoever, including a reliable expert opinion that meets *Daubert*'s standards, that establishes a causal link between the Jail's actions or inactions regarding

the handling of Nottestad's conditions of confinement and his passing of multiple transmural duodenal ulcers.

## A. The Cause of Nottestad's Death

Mr. Nottestad suffered from multiple transmural duodenal ulcers perforating through the duodenum and into the peripancreatic fat, resulting in a gastrointestinal hemorrhage.  Duodenal ulcers have been explained by other courts as follows:

> A duodenal ulcer is an open sore (peptic ulcer) that "occur[s] on the inside of the upper portion of [the] small intestine (duodenum)." Peptic Ulcer, Symptoms and Causes, Mayo Clinic, available at: http://www.mayoclinic.org/diseases-conditions/peptic-ulcer/symptoms-causes/syc-20354223 (last accessed Sept. 19, 2018).1 Treatment can vary depending on the cause of the ulcer, but, generally speaking, the condition is treated with medications that reduce or neutralize stomach acid. Peptic Ulcer, Diagnosis and Treatment, available at: https://www.mayoclinic.org/diseases-conditions/peptic-ulcer/diagnosis-treatment/drc-20354229 (last accessed Sept. 19, 2018).

*Barnes v. IDOC*, No. 17-1084, 2018 WL 10158805, at *1 (C.D. Ill. Oct. 2, 2018).  The duodenal is the first part of the small intestine.[4]  Transmural means passing or administering through an anatomical wall or involving the whole thickness of a wall.[5]  Thus, the ulcers were existing across the entire wall of the duodenal.

The autopsy report indicated the duodenal ulcers were consistent with peptic ulcers.  A peptic ulcer is a type of, and broader disease state of, duodenal ulcer.[6]  Peptic ulcers typically

---

[4] See https://www.merriam-webster.com/dictionary/duodenal and *Davidson v. Helder*, No. 5:18-CV-05239, 2019 WL 6917895, at *2 n. 6 (W.D. Ark. Dec. 19, 2019), aff'd, 825 F. App'x 407 (8th Cir. 2020) (observing same and relying upon medical literature from National Library of Medicine's "MedlinePlus" and also Mayo Clinic).  See also *Rowe v. Gibson*, 798 F.3d 622, 628 (7th Cir. 2015) (relying on medical literature from reputable medical institutions); *Leiser v. Hannula*, No. 15-CV-328-SLC, 2017 WL 4083182, at *16 (W.D. Wis. Sept. 14, 2017) (using readily available information on the Mayo Clinic's website).

[5] See https://www.merriam-webster.com/medical/transmural#:~:text=Medical%20Definition%20of%20transmural,a%20wall%20transmural%20myocardial%20infarction.

[6] See National Library of Medicine. Duodenal Ulcers https://www.ncbi.nlm.nih.gov/books/NBK557390/ at "Introduction" ("Duodenal ulcers are part of a broader disease state categorized as peptic ulcer disease. Peptic ulcer disease refers to the clinical presentation and disease state that occurs when there is a disruption in the mucosal surface at the level of the stomach or first part of the small intestine, the duodenum. ")

develop gradually over time and progressively worsen unless diagnosed and treated properly.[7]

"Most patients with peptic ulcer disease, up to 70%, are asymptomatic. Overall, dyspepsia is the most common symptom for patients who do experience symptoms."[8] "Dyspepsia is another word for indigestion. People with chronic indigestion often report feelings of stomach pain, over-fullness and bloating during and after eating. Other common symptoms include acid reflux, heartburn and excessive burping."[9] "These symptoms resemble peptic ulcer disease, but when tested, only 1/3 of people will have a stomach ulcer — the other 2/3 will have functional dyspepsia."[10]

"The two primary causes for duodenal ulcers are a history of recurrent or heavy NSAID use and a diagnosis of *H. pylori*." "While most duodenal ulcers present with dyspepsia as the primary associated symptom, the presentation can range in severity levels, including gastrointestinal bleeding, gastric outlet obstruction, perforation, or fistula development. Therefore, the management is highly dependent on the patient's presentation at the time of diagnosis or progression of the disease."[11] "Patients who initially present with ulcer-related complications may present with symptoms suggestive of upper GI bleed, including melena, hematemesis, elevated BUN, and anemia of varying degrees in severity with associated fatigue. Patients who present with more alarming symptoms such as anemia, melena, or hematemesis, which may represent perforation or bleeding, will likely require more invasive forms of evaluation."[12]

---

[7] *Id*. at "History and Physical" ("The presentation of patients with symptoms consistent with dyspepsia or peptic ulcer disease, and most specifically, duodenal ulcers, can vary highly depending on the degree of disease progression and time when a patient seeks treatment. … As noted above, the degree of disease progression before the initial diagnosis can affect the symptoms with which a patient may present. …").

[8] *Id.*

[9] See Cleveland Clinic's "Functional Dyspepsia" at https://my.clevelandclinic.org/health/diseases/22248-functional-dyspepsia#:~:text=Dyspepsia%20is%20another%20word%20for,reflux%2C%20heartburn%20and%20excessive%20burping.

[10] *Id*.

[11] *Id*. at "Introduction"

[12] *Id*. at "History and Physical"

**B.  The Complaint Does not Allege and Plaintiff Cannot Show any Admissible Evidence of Causation that Meets the Strict Requirements of *Monell*.**

Any theory that Nottestad's death was caused by the conditions in his cell is too remote and speculative to support a verdict against the County. To impose governmental liability under *Monell*, the challenged policy or practice must be the "moving force" behind the alleged constitutional violation. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). To do so, a plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id*.

Simple but-for causation is not enough. *See Wilson v. Cook Cty.*, 742 F.3d 775, 784 (7th Cir. 2014) (*citing Brown*, 520 U.S. at 410). Instead, the challenged policy or practice "must be closely related to the ultimate injury" that the plaintiff suffered. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391, 109 S. Ct. 1197, 103 L.Ed. 2d 412 (1989). In other words, there must be a "direct causal link" between a policy or practice and the alleged constitutional violation. *Estate of Sims ex rel. Sims v. Cty. of Barbeau*, 506 F.3d 509, 515 (7th Cir. 2009) The Seventh Circuit has made clear that a "moving force" is the "catalyst" for the injury in question, not merely a "contributing factor." *Johnson v. Cook Cty.*, 526 F. App'x 692, 696 (7th Cir. 2013); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 307 (7th Cir. 2010) (training or policy changes that "might" have had an effect on plaintiff's treatment did not satisfy causation requirement).

This causation requirement is stringent, and for good reason—the broad application of causation principles would otherwise render municipalities vicariously liable for actions not directly attributable to its own. *Brown*, 520 U.S. at 405.

> Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability. As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable

> unless deliberate action attributable to the municipality directly caused a deprivation of federal rights.

*Id.* at 415. While articulated in the context of inadequate pre-employment screening, *Brown's* instruction remains undiminished and applies with equal force here.

For example, the Seventh Circuit just recently upheld summary judgment dismissal on a *Monell* claim against Milwaukee County and Armor Correctional Health Service, Inc. (contracted with the county to provide healthcare services to Milwaukee County Jail inmates) in a case involving an inmate's death at the Milwaukee County Jail because the plaintiff failed to offer evidence sufficient to establish either deliberate indifference or moving force causation. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022). The inmate in *Stockton* suffered from various ailments, including a history of intravenous drug abuse and a congenital heart defect, upon arriving at the county jail. *Id.* at 610-11. Over the course of a month, the inmate developed infective endocarditis, a serious and occasionally fatal heart infection. *Id.* at 611-12. Although medical staff treated the inmate repeatedly for numerous complaints during this period, none diagnosed the infective endocarditis. *Id.* By the end of the month, the inmate died. *Id.* at 613.

The plaintiff argued that Armor and the County's failure to maintain adequate medical staffing levels and process "sick call slips" amounted to a widespread practice that caused the jail's medical providers to neglect to respond to the inmate's sick call slips, thus depriving him of constitutionally adequate medical care. *Id.* at 617. The court held the plaintiff failed to establish deliberate indifference to the purportedly unconstitutional effects of a widespread practice because the plaintiff did not supply adequate evidence of other inmates similarly harmed from which a jury could reasonably find Armor and the County would "'conclude that the plainly obvious consequences' " of the practice "would result in the deprivation of a federally protected right," as

is required to establish deliberate indifference. *Id.* (*quoting Gable v. City of Chi.*, 296 F.3d 531, 537 (7th Cir. 2002).

The court also found the plaintiff failed to identify evidence that medical staffing levels or sick call slip processing *caused* the inmate to receive constitutionally inadequate medical care. Consequently, "Stockton's claim for *Monell* liability fail[ed] to establish moving force causation." *Id.* at 618. The court's reasoning is worth citing in full:

> A sick call slip was entered on Madden's behalf on October 25, 2016, in which Madden complained of "bad symptoms" from "severe allergies" and requested new antihistamines. The MCJ designated the sick call slip high priority and scheduled Madden for a follow up on October 26, 2016. MCJ medical staff did not follow up with or see Madden, however, until his death in the early hours of October 28, 2016. Stockton points to some evidence inadequate medical staffing at the MCJ may have caused this lapse. But Stockton does not present evidence that Madden would have been diagnosed with infective endocarditis or received lifesaving treatment had MCJ medical staff seen him between October 26, 2016, and October 28, 2016, based upon his complaint about his allergies. The testimony of Stockton's expert that "[i]t is [ ] probable that ... signs of [infective endocarditis] would have been present and led to further medical evaluation and treatment with ultimate admission to the hospital" during this period is entirely speculative and does not create a genuine issue of fact. The sole evidence of Madden's symptoms at the time is the sick call slip itself. We are not convinced a jury could reasonably conclude a timely response by MCJ medical staff to Madden's allergy complaint would have led to the correct diagnosis or treatment for infective endocarditis.

*Id. See also Walker v. Peters*, 233 F.3d 494, 502 (7th Cir. 2000) (granting summary judgment for defendants where inmate could only speculate that refusals to provide treatment caused injury); *Terry v. Cnty. of Milwaukee*, No. 17-CV-1112-JPS, 2018 WL 2567721, at *11 (E.D. Wis. June 4, 2018) (granting judgment on the pleadings for the County because the connection between the plaintiff's injury during childbirth and the challenged practice of ignoring inmates' medical needs is too highly attenuated and nebulous to say that such a practice was the "moving force" behind the mistreatment).

Here, the Estate cannot show a genuine evidence that the LaCrosse County Jail conditions resulted from policies and procedures that were the "moving force" that actually *caused* him to

develop multiple transmural duodenal ulcers perforating through the duodenum and into the peripancreatic fat or a gastrointestinal hemorrhage, resulting in his death.

At no point in the treatment records at Gunderson Lutheran or at the jail did he disclose to anyone that he had ulcers or was taking any medication relating to such condition.  He left Gunderson with the medical staff's discharge instructions focusing on his facial injury and mental health, not anything involving ulcers nor even more generally his stomach, intestines or abdomen. No one at Gunderson observed any symptoms of or concerns with potential deadly ulcers.  No one at Gunderson raised alarm that he had heavy NSAID use and/or a diagnosis of *H.pylori* such that his conditions of confinement should be handled differently so as to avoid ulcer-related serious injury or death.

The nursing staff at the jail who diagnosed his symptoms never came to the conclusion that he was suffering from such severe ulcers.  While the Estate may believe they should have dug deeper, done more or sent him to the hospital, he was just at the hospital days before and that medical team did not pick-up on his situation.  It cannot be that the Estate can lay that blame on the County for having policies that were "moving force" of his conditions that caused his death under these circumstances when medical professionals own policies, practices and procedures did not reach the determinations that he faced a serious ulcer-related impending death or serious injury.

Moreover, neither Nottestad nor the nurses informed any jailer that his various symptoms (back pain, groin/hernia-type pain, nausea, toe discoloration, and high blood pressure) meant he was suffering multiple transmural duodenal ulcers linked to any aspect of his condition of confinement.  Without that information, the Estate cannot link how the jail should have proceeded in order to avoid any alleged policy, practice or procedure being the moving force of his death.

Even assuming the nurses erred in their medical assessment of his various symptoms (back pain, groin/hernia-type pain, nausea, toe discoloration, and high blood pressure), it is still the case they checked him repeatedly and just 80 minutes before his death they checked his vitals and did not believe him to be in an emergency or in some kind of severe ulcer-related distress like sepsis shock such that his conditions of confinement were putting him on the edge of a fatal medical situation.[13]

In any event, it is still the case that Plaintiff cannot show that any mobility, toilet-related or other conditions-related issue was directly causal to the final diagnosis.[14]  In this case, the ulcer was transmural, meaning that it extended across the entire wall of the duodenum. Because these ulcers were in a progressed state, they were present prior to his admission to LaCrosse County Jail and cannot be attributable to any policy or practice involving his conditions of confinement.

Despite causation being a necessary element of its *Monell* claim, the Estate offers no medical theory at all in the Complaint and, as discussed below, has introduced no expert to tie-up the causation conundrum in this case. Plaintiff cannot build a *Monell* claim through speculation; such speculation hardly links together the jail conditions of confinement allegations (cleanliness

---

[13] When shock is present, a person's blood pressure is low and heart rate is high. See, e.g., https://www.medicalnewstoday.com/articles/low-blood-pressure-high-pulse#summary ("Summary"); https://www.mayoclinic.org/diseases-conditions/cardiogenic-shock/symptoms-causes/syc-20366739 ("Symptoms").

Mr. Nottestad's vital signs were checked on 9/4/20 at 9:20 A.M., just 80 minutes before he was found unresponsive. His blood pressure was high rather than low (160/100) and his heart rate was normal (84 beats per minute). See https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982 (blood pressure chart); https://www.mayoclinichealthsystem.org/hometown-health/speaking-of-health/know-your-numbers-heart-rate (heart rate chart for 55 to 60 year range)

Therefore, these vital signs would not be concerning for shock.

[14] While the autopsy report indicated that stool was present in the small and large intestine, there is no indication therein that a bowel obstruction (blockage) was present. The autopsy results did not indicate a diagnosis of bowel obstruction, which is a complication related to duodenal / peptic ulcers. See National Library of Medicine. Duodenal Ulcers at "Complications" https://www.ncbi.nlm.nih.gov/books/NBK557390/.  When a bowel obstruction is present, there is impacted fecal matter which indicates poor or improper defecation.  There is no indication or evidence in the autopsy report that fecal impaction of the intestines played a factor in the death. Based on the autopsy findings, the video, and the jail logs, Mr. Nottestad was adequately defecating.

of the cell, access to a toilet and mobility) with the cause of his death.  This absence of proof calls for vigorous speculation when juxtaposed against the record in this case involving complex medical issues, repeated nursing assessments and repeated attention to the inmate by the jail staff all taking place without having any information from the inmate or discharging hospital about his underlying medical condition.

### C.   Plaintiff Has Not Produced Any Expert Opinion Meeting the *Monell* Standards that Directly Links Nottestad's Death to the Conditions of His Confinement.

The Estate offers no expert opinion involving specialized training and education in the field of medicine to show that anything the Jail did, or failed to do, caused Nottestad's death. While expert testimony is not generally needed to prove causation, it is needed in cases involving sophisticated medical issues such as the one. The Seventh Circuit in *Myers v. Illinois Cent. R. Co.*, stated that "when there is no obvious origin to an injury and it has multiple potential etiologies, expert testimony is necessary to establish causation." 629 F.3d 639, 643 (7th Cir. 2010) (citation and internal quotation marks omitted).  See also *Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002) (in a case involving a prisoner that suffered a stroke after prison officials failed to provide him with blood pressure medication, the court held: "Although a person suffering from a stroke may exhibit visible symptoms, the stroke itself is a sophisticated injury which could be caused by numerous factors other than lack of medication. Therefore, expert medical testimony is needed to prove causation.").

The Estate has no evidence through expert testimony that shows Nottestad's death was caused by the conditions in his cell or of his confinement. Nor is there any testimony or evidence that Nottestad's death would have been prevented had conditions in the cell been different, such as having the cell cleaned more than the jail did, having access to a standard toilet earlier in his detention, having a cane or walker in the suicide cell, or the like. Plaintiff's theory of the case

guesses that circumstances could have been different had Nottestad been given such additional accommodations. But these mere possibilities, without supporting expert testimony describing what would have occurred (not merely what "could have" occurred), is not sufficient as a matter of law to build its civil rights claim against the County. Plaintiff's approach, essentially, amounts to nothing more than the sort of *post hoc ergo propter hoc* evidence that is routinely rejected as proof of causation. *Flint v. City of Belvidere*, 791 F.3d 764, 772 (7th Cir. 2015) ("As this Court has repeated time and again, [a *post hoc, ergo propter hoc* argument] is not a good way to prove causation."). *See also Norwood v. Ghosh*, 723 Fed. Appx. 357, 366 (7th Cir. 2018) ("The mere possibility that delays in treating [plaintiff]'s knee contributed to permanent damage falls short of verifying medical evidence that would allow a reasonable jury to find by a preponderance of the evidence that such causation actually occurred."). There is no medical testimony that if additional accommodations would have been provided, Nottestad would not have died of his ulcer condition.

## III.   THIS COUNTY SHOULD BE DISMISSED BECAUSE IT HAS BEEN IMPROPERLY JOINED IN THIS LAWSUIT.

"A litigant cannot throw all of his grievances, against dozens of different parties, into one stewpot." *Wheeler v. Wexford Health Sources, Inc.,* 689 F.3d 680, 683 (7th Cir. 2012). But that is what the Estate has done here, and it has done so in order to cause unfair prejudice to the County in the event there is a triable claim to a jury.

The Estate sued ACH and the nurses for medical care-related claims and issues. The essence of the claims is medical malpractice. However, it also sued the County. The Estate did not sue the County about medical issues, such as with respect to the choice of or supervision of the medical care delivery/system in the jail. Nor did the Estate sue a single jailer or correctional administrator in this case about any medical (or any other) claim.

Rather, the Estate instead sued La Crosse County alone, alleging unconstitutional conditions of confinement allegations wholly separate from the medical care claims and the medical-related issues of Mr. Nottestad's death. The sole claim against the County is wholly unrelated to the claims for deliberate indifference to a serious medical need as alleged against ACH and the individual nursing Defendants.

The Estate has ignored the Federal Rules of Civil Procedure and Seventh Circuit law by attempting to improperly join the County with disparate and unrelated Defendants in a single action without alleging any coordinated action between them or any right to relief that arises out of "the same transaction, occurrence, or series of transactions or occurrences." Therefore, the County should be dismissed because there is no allegation of, or any factual basis for alleging, a connection between the claims and Defendants.

Rule 18 of the Federal Rules of Civil Procedure permits a plaintiff to bring in one lawsuit for every claim he or she has against a single defendant. Fed. R. Civ. P. 18(a). However, there are limits to the breadth of a lawsuit in federal court. Rule 20(a)(2) permits joinder but requires that the plaintiff assert at least one claim against all of them "arising out of the same transaction, occurrence, or series of transaction or occurrences" and that "any question of law or fact common to all defendants will arise in the action." As the Seventh Circuit has noted, Rule 20(a) states that "all persons . . . may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." *George v. Smith*, 507 F.3d 605, 607 (7th Cir., 2007). Federal courts have "considerable discretion" and "flexibility" in applying Rule 20. *UWM Student Ass'n v. Lovell*, 888 F.3d 854, 863 (7th Cir. 2018).

These two rules working together mean "[u]nrelated claims against different defendants belong in different suits." *Id.* "[M]ultiple claims against a single party are fine but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2." *Id.* Where a party has been misjoined, Fed. R. Civ. P. 21 provides that "[on] motion or on its own, the court may at any time, on just terms, add or drop a party."

Several decisions provide guidance, all pointing towards the Estate's noncompliance with the joinder rules and the need for dismissing the County from this lawsuit. In *UWM Student Association v. Lovell*, 888 F.3d 854, 856 (7th Cir. 2018), forty-four former and current UWM students sued thirty-seven defendants. The first five claims in the complaint are §1983 claims alleging denials of due process and First Amendment retaliation and, in one count, a violation of one plaintiff's freedom of religion. *Id.* The district court dismissed the case with prejudice. *Id.* at 857. The district court dismissed the claims against several individual defendants for untimely service; it dismissed the state law claims based on state sovereign immunity; and the rest of the claims were dismissed for misjoinder. *Id.*  The Seventh Circuit agreed with the district court's observation but stated that the district court erred in dismissing the remaining claims with prejudice, as remedy for misjoinder is severance or dismissal without prejudice. *Id.* at 863.  The court found there were limits to joining claims and defendants: "Unrelated claims against different defendants belong in different suits." *Id.* (*quoting George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007)).

In *George v. Smith*, 507 F.3d 605, (7th Cir., 2007), George filed suit against twenty-four defendants with approximately fifty distinct claims. The court, interpreting Rule 20(a), stated "a buckshot complaint that would be rejected if filed by a free person  - say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed

his copyright, all in different transactions – should be rejected if filed by a prisoner." *Id.* The court further stated that George did not make any effort to show that the twenty-four defendants he named had participated in the same transaction or series of transactions or that a question of fact is "common to all defendants." *Id.* Thus, the court dismissed the claims holding that they should have been brought in separate actions.

Here, the Estate asserts entirely different claims against entirely different Defendants. The Estate's claim against ACH is one for deliberate indifference to a serious medical need, and the same is alleged against the individual nursing Defendants. However, the claim against the County is one solely for unconstitutional conditions of confinement. The County alone was sued for its alleged policy of not timely cleaning Nottestad's cell or not providing him a cane or brace while in the suicide cell. This claim is completely unrelated to Nottestad's medical care. The only tangential connection that can possibly link the Defendants and the Estate's claims is the fact that the events giving rise to this lawsuit took place at the La Crosse County Jail. That alone does not satisfy the requirement that at least one claim against the Defendants must "aris[e] out of the same transaction, occurrence, or series of transaction or occurrences" and that "any question of law or fact common to all defendants will arise in the action." Accordingly, the Estate's election to join different Defendants on different transactions into one suit amounts to violation of Rule 20(a)(2) and therefore, the court should dismiss the County form this suit.[15]

## **CONCLUSION**

For the reasons explained above, La Crosse County respectfully asks the Court to grant its Motion for Summary Judgment and dismiss this lawsuit as against the County.

---

[15] The County reserves the right to further address these concerns by way of a Motion to Bifurcate claims, issues and defendants and motions in limine addressing various evidentiary features of Plaintiff's case which are clearly meant to build a case against the County, not on the facts and governing law, but the sympathy or passion tied to Mr. Nottestad's passing in jail.

Dated this 23rd day of September, 2022.

**MUNICIPAL LAW & LITIGATION GROUP, S.C.**

Attorneys for La Crosse County


By:   *Electronically signed by Remzy D. Bitar*
    REMZY D. BITAR
    State Bar No: 1038340
    LUCAS C. LOGIC
    State Bar No.  1115461

    730 N. Grand Avenue
    Waukesha, WI 53186
    O: (262) 548-1340
    F:  (262) 548-9211
    E: rbitar@ammr.net
       llogic@ammr.net