UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF JEFFERY NOTTESTAD, by its
Special Administrator Arianne Clark,

    Plaintiff,        CASE NO. 21-CV-535

v.

LA CROSSE COUNTY,

    Defendant.

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

  NOW COMES the plaintiff, The Estate of Jeffery Nottestad, by its Special Administrator Arianne Clark, by its attorneys, GINGRAS, THOMSEN & WACHS, LLP, by attorney Paul A. Kinne, hereby submits this brief in Opposition to Defendant's Motion for Summary Judgment.

  I.  INTRODUCTION.

  As a matter of policy and custom, La Crosse County places inmates at risk of suicide in medical cells without anything except a suicide smock and blanket and a mattress that lies on the floor. As a matter of policy and custom, those cells have a grate in the floor instead of a toilet, no running water and no grab bars for inmates with impaired mobility. As a matter of policy and custom, La Crosse County does not provide inmates with mobility impairments with adult disposable undergarments. Accordingly, as a matter of policy and custom, when a suicidal inmate with mobility impairments is placed in the suicide watch cell, that inmate has no choice but to crawl through the cell like an animal if he wants to move in his cell. The inmate must either crawl to the grate to urinate and defecate while lying on the floor, then crawl back across that floor to his

mattress, which is also on the floor, or the inmate must urinate and defecate from his bed. If the inmate then wishes not to lie next to his excrements, he must fling his urine and feces toward the grate.

The Eighth and Fourteenth Amendments to the United States Constitution protect inmate dignity. A county violates that protected dignity when it forces inmates to lie next to their own filth and to crawl on their stomachs to move about their cells. For over 48 hours, La Crosse County, pursuant to its policies, forced Jeffery Nottestad to make a choice. He could defecate and urinate from his bed, and, if he did not then want to lie next to his feces or urine, he could throw it with his hand toward the grate toilet. Or he could drag himself across the floor and urinate or defecate into the grate while lying down, then crawl back across the floor to his bed. Either way, La Crosse County deprived him of the minimal level of dignity required by the Constitution. Therefore, the motion for summary judgment should be denied.

II.   STATEMENT OF FACTS.

On January 22, 2020, Nottestad attempted suicide by shooting himself in the head. PPFOF 70.[1] Fifteen years earlier, he suffered a stroke that left him paralyzed on his left side. PPFOF 71. In order to ambulate, he had to use a cane and a leg brace. PPFOF 72.

Because of an earlier conviction, Nottestad was not allowed to possess weapons. After some time in the hospital, Nottestad was placed in custody at the La Crosse County Jail (LCCJ) while he awaited adjudication of his firearm violation.

On January 31, 2020, Nottestad was booked into the LCCJ. He was placed on suicide watch – specifically in Medical Cell 3 (Med Cell 3) – which was a padded cell that had a grate in the

---

[1] The plaintiff relies on its Proposed Findings of Fact for the complete recitation of material facts in this matter.

floor for a toilet and a mattress on the floor for a bed. PPFOF 78. Nottestad had a suicide smock for clothing and was allowed a non-tear blanket. PPFOF 46. There was no running water in the cell. PPFOF 46. Med Cell 3 was under constant video surveillance, and officers would visually check Nottestad every 15 minutes. PPFOF 67, 69. Med Cell 3 did not have bars that Nottestad could use to pull himself to a standing position.

While in Med Cell 3, Nottestad could only get to a standing position with great difficulty. By policy or practice, he was not allowed a leg brace, a cane or a wheelchair in Med Cell 3. PPFOF 61. La Crosse County provided Nottestad with no accommodations for his disability.

By keeping Nottestad in Med Cell 3 without any accommodations, La Crosse County forced him to live in a degrading fashion. On February 1, because he could not get to the grate in the floor without great physical struggle, he was forced to urinate in his drinking cup from his sleeping pad and throw it toward the grate. PPFOF 79, 80. Alternatively, he would have to lie on his mattress and urinate from it toward the grate. PPFOF 83. Sometimes, his blanket would come into contact with his urine on the floor of his cell. PPFOF 83.

If Nottestad wanted to defecate, he had to crawl like an animal to the grate. On February 1, 2020, at 8:41 a.m., Nottestad can be seen defecating on the floor grate and crawling back to his mattress on the floor, with the feces still lying on the grate. PPFOF 82. An officer did not clean the feces until 11:17 a.m. PPFOF 82.

When Nottestad was able to get to a standing position, it was only after he crawled to the wall where he struggled to get to a standing position, then used the wall for support to ambulate to the grate, clinging to the wall with his one good hand while shuffling his one good leg forward. PPFOF 95. Nottestad had no choice but to crawl across the floor to the wall to be able to get to

something like a standing position. But even then, movement around the wall was precarious: he was at great risk of falling.

On February 2, Nottestad remained in Med Cell 3. On February 2, 2020, between 2:34 and 11:59 a.m., Nottestad can be seen crawling around his cell on 25 separate occasions. PPFOF 95. On three occasions, he can be seen crawling to a wall where he struggles to a standing position to urinate over the floor grate. PPFOF 95.

Also on February 2, 2020, at 12:16 p.m., Nottestad defecated on the floor. PPFOF 96. To get the feces from the floor to the grate, he grabbed it with his toilet-tissue-covered hand and tossed his feces toward the floor grate. PPFOF 96. A few minutes later, he pushed his feces over the grate. PPFOF 96.

Further on February 2, 2020, from 12:25 to 12:35 p.m., Nottestad struggled to move around his cell, often spinning around in one place or crawling on the floor. PPFOF 97. He can also be seen crawling through his cell on four occasions from 12:47 to 1:10 p.m. PPFOF 97. Nottestad can again be seen crawling in his cell at 7:37 p.m. PPFOF 99.

On February 2, 2020, at 4:30 p.m., Nottestad urinated from his bed toward the grate, and his urine formed a puddle next to his bed where his blanket came into contact with the urine. PPFOF 98. A similar incident can be observed at 6:27 and 10:21 p.m. PPFOF 98.

Matters did not improve on February 3. On February 3, 2020, Nottestad can be seen crawling in his cell between 12:29 and 8:09 a.m. more than 14 times. PPFOF 114.

On February 3, 2020, between 12:38 and 12:44 a.m., Nottestad defecated from a lying position. PPFOF 115. He grabbed the feces and threw it toward the floor grate. PPFOF 115. At 12:41, he crawled to the grate to finish defecating where he defecated on the floor. PPFOF 116.

He then dragged his foot through the defecation, smearing the feces on the floor of his cell. PPFOF 116. Nottestad crawled back to his mattress which was on the floor with multiple pieces of feces and fecal smears. PPFOF 116.

Also on February 3, 2020, Nottestad defecated into his hand while on his bed, throwing the defecation toward the grate. PPFOF 117. For about 15 minutes afterwards, he wiped his hand repeatedly on his bed and blanket. PPFOF 117. Again at 2:37 a.m., Nottestad defecated into his hand, throwing the feces toward the grate. PPFOF 117. Then at 2:40 through 2:43 a.m., Nottestad defecated onto the floor from his bed, swatting the feces with his hand toward the grate. PPFOF 118. He repeated this sequence again at 2:45 a.m., at which time feces was on his blanket. PPFOF 118. The feces was not cleaned until 6:43 a.m., and even then, his soiled bedding was not changed. PPFOF 119.

By the time Nottestad was moved out of Med Cell 3, Nottestad had abrasions on the top of his foot, on his knee, and on his chin and nose from being forced to crawl with only one functioning arm and one functioning leg. PPFOF 121. Nottestad was moved from the padded cell to Cell 13. PPFOF 120.

In Cell 13, the toilet was on Nottestad's bad side which forced Nottestad to go around the total circumference of the cell to access the toilet. PPFOF 125. The toilet was on the other side in Cell 14. PPFOF 125. Nottestad used his good side to push off the wall and hold himself up to go to the bathroom or get water in Cell 13. PPFOF 126. On the morning of February 4, Jailer Flaherty told Wolf that he noticed that Nottestad was struggling to move in his cell and asked Nottestad if a walker would help. PPFOF 127. Wolf asked Nottestad if Cell 14 would be better, and Nottestad agreed. PPFOF 128. On February 4, Nottestad was moved from Cell 13 to Cell 14 because Nottestad was having difficulty moving around the cell to use the toilet. PPFOF 129.

Nottestad complained about being in Med Cell 3. PPFOF 90, 91. On February 1, he asked for a wheelchair or a chance to exit the cell to be able to ambulate. PPFOF 92. All of his requests were denied, in compliance with jail policy. PPFOF 93. On February 2, Nottestad said to Wolf, "Help me." PPFOF 106. Wolf asked Nottestad what he needed help with. PPFOF 107. Wolf offered to get the nurse for Nottestad. PPFOF 108. Nottestad told Wolf that the nurses were not doing anything for him. PPFOF 109. Wolf pushed back and asked what Nottestad meant by that. PPFOF 110. Nottestad responded that he did not want to be in the padded cell. PPFOF 111. Nottestad complained about being in pain while in the padded cell. PPFOF 112. Nottestad told Siddons that he had back pain and was not able to move well on one of his sides. PPFOF 113. Nottestad mentioned that he had a previous stroke and could not move one of his sides very well. PPFOF 113.

Tragically, Nottestad spent his last days alive crawling through his urine and excrement. He died on February 4, 2020, after spending about an hour in Cell 14.[2] PPFOF 130.

III. STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue of material fact. *Bogan v. Wexford*, 2022 U.S. Dist. LEXIS 174148, *12-13 (S.D. Ill.). The Court must draw all reasonable inferences in favor of the nonmovant, and any doubt as to the existence of a genuine issue of fact must be resolved against the moving party. *Id.*

IV. LA CROSSE COUNTY'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED.

---

[2] Nottestad is not claiming that the conditions of confinement caused his death. Instead, his estate seeks to recover for the harm caused by the cruel and unusual punishment Nottestad experienced from February 1 through February 4, 2020.

A. Nottestad has stated a violation of his Constitutional right to be free from cruel and unusual punishment.

It has been clearly established for decades that jails must provide inmates with reasonably adequate sanitation, bedding, hygienic materials and utilities. *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019). Days long exposure to human waste states a claim of cruel and unusual punishment. *Id.,* at 821. Exposure to human waste, like few other conditions of confinement, evokes health concerns and the more general standards of dignity embodied in the Eighth Amendment. *Melton v. Godinez*, 2013 U.S. Dist. LEXIS 147697, *7 (C.D. Ill.). Moreover, denying a disabled inmate a means by which to ambulate, thus forcing the inmate to crawl across his cell to move, states a violation of the Eighth Amendment. *Thompson v. Lampert*, 2004 U.S. Dist. LEXIS 15256, 22-23 (D.Or.).

Pretrial detainees may assert a conditions-of-confinement claim under the Fourteenth Amendment's Due Process Clause if subjected to "adverse conditions that deny the minimal civilized measure of life's necessities." *Johnson v. Foster*, 2020 U.S. Dist. LEXIS 183599 (N.D. Ill.) *3-4, *Hardeman v. Curran*, 933 F.3d 816, 821-22 (7th Cir. 2019) (internal quotation marks omitted). A detainee can state such a claim by alleging that: (1) the defendant "acted purposefully, knowingly, or perhaps even recklessly" as to the conditions of the detainee's confinement; and (2) the defendant's conduct was objectively unreasonable. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 353-54 (7th Cir. 2018). Unlike in the Eighth Amendment context, deliberate indifference—the defendant's subjective awareness that his conduct was unreasonable and a failure to respond to it—is not required. *See id.* at 350-54, *see also Johnson v. Foster*, 2020 U.S. Dist. LEXIS 183599, at *3-4 (N.D. Ill. Oct. 5, 2020).

The record is replete with evidence that the defendant acted knowingly. It knew that Nottestad was paralyzed on his left side, making it impossible for him to walk without assistance.

In fact, it knew that mobility-disabled inmates would come into the jail. It knew that it placed Nottestad into a cell with no wheelchair, cane or leg brace. In fact, the cell even lacked bars by which Nottestad could lift himself to a standing position. It knew that Nottestad would have to crawl across his cell to use the toilet grate, whether to urinate or defecate. Alternatively, it knew that because of Nottestad's inability to ambulate, he would have to urinate while lying down or from his bed, meaning that urine and feces would collect on the floor, forcing Nottestad to use his hands to fling his defecation toward the toilet grate, which he could not flush. It further knew he would have to crawl across his cell to get access to his food. In other words, La Crosse County was aware of the conditions of Nottestad's confinement.

There is also evidence that La Crosse County's conduct was objectively unreasonable. There is simply no reason a person on suicide watch who cannot walk should be deprived of the basic need of access to toilet facilities or be forced to crawl through his cell to get to the door for his food. If it would have been unreasonable to require an inmate capable of walking without assistance to crawl on the floor across the floor where he urinated and defecated, or to require that inmate to choose whether to crawl to the wall and struggle around the side of his cell to urinate, or to urinate in his drinking cup, then it would be unreasonable to expect a mobility-disabled person like Nottestad to do so. If it would have been unreasonable to require an inmate capable of walking to choose whether to crawl to the wall and struggle around the side of his cell to urinate, or to urinate in his drinking cup, then it would be unreasonable to expect a mobility-disabled person like Nottestad to do so. In other words, forcing Nottestad to crawl through his cell and throw his feces into the toilet is not rationally related to a legitimate governmental objective, or excessive in relation to that purpose. *Ford v. Cty. of Winnebago*, 2022 U.S. Dist. LEXIS 10469 *18 (N.D. Ill.). *See Houston v. PTS of Am.*, 2021 U.S. Dist. LEXIS 49946 *30-31 (E.D. Wis.).(Depriving an

inmate of access to a bathroom for several hours to the point where the inmate is forced to defecate and urinate on the floor and sit in it sufficiently states a claim under the Eighth Amendment).

The case of *Bradley v. Jones*, 2020 U.S. Dist. LEXIS 108629 (S.D. Ill.), is analogous to the facts of this case. The *Bradley* court held:

> Once placed on suicide watch, Bradley alleges that Mental Health Doctor John Doe 3 did not provide him the necessary accommodations. He was not given catheters, diapers, or a wheelchair and confined in his bed, forced to lay in his own feces and urine. Bradley's preexisting condition and paralysis of his right leg rendering him double incontinent and wheelchair bound could easily be considered serious medical conditions, and the refusal of John Doe 3 to treat those conditions may constitute deliberate indifference. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citations omitted). Therefore, Count 6 survives screening.
> Additionally, leaving Bradley in the suicide cell without proper medical supplies forcing him to lay in his own waste also adequately pleads an Eighth Amendment claim for unconstitutional conditions of confinement, and Count 7 will proceed against John Doe 3. *See Wheeler v. Walker*, 303 F. App'x 365, 368 (7th Cir. 2008) ("Exposure to human waste, like few other conditions of confinement, evokes both the health concerns...and general standards of dignity...") (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir.2001)).

*Bradley*, at *14-15. Additionally, depriving an inmate of a wheelchair, which in turn deprives the inmate of the ability to use the toilet facilities, is a violation of the Eighth Amendment. *Morrison v. Scdc*, 2021 U.S. Dist. LEXIS 183354, *17-19 (D.S.C.).

The case of *Harvey v. Duncan*, 2018 U.S. Dist. LEXIS 168039 (S.D. Ill.), is also relevant to this case. In *Harvey*, the district court held that inmates are entitled to humane conditions of confinement. *Id.,* at *16-21. It held that the Eighth Amendment was violated when 1) there is a deprivation that is, from an objective standpoint, sufficiently serious that it results in the denial of the minimal civilized measure of life's necessities. *Id.* With respect to the Eighth Amendment, the *Harvey* court framed the question: "[T]he question is whether placing Harvey in a cell that was not wheelchair accessible denied him one of life's necessities. The Seventh Circuit has held that sanitation and utilities qualify as identifiable human needs." *Id.* The district noted that denying

Harvey a wheelchair also denied him access to the toilet. *Id.* The defendant responded that Harvey was not totally prevented from access to the toilet, so the claim should be dismissed. *Id.*

In response, Harvey pointed out that he could only get to the toilet if he crawled across the floor of his cell. *Id.* The *Harvey* court held that because there was an issue of fact with respect to whether Harvey could access the toilet only if he crawled across his cell, the motion for summary judgment concerning whether the jail deprived Harvey of one of life's necessities was denied. *Id.*

The defendant argues that the Eighth Amendment standard applies to this case, instead of the Fourteenth Amendment standard. Although the Seventh Circuit has not conclusively ruled on whether the Fourteenth Amendment standard applies to pretrial detainees, in multiple cases where the issue arose district courts applied the Fourteenth Amendment standard instead of the Eighth Amendment standard. *Beaty v. Allen Cty.*, 2020 U.S. Dist. LEXIS 232307, *2-3 (N.D. Ind.), *Bennett v. Syed*, 2022 U.S. Dist. LEXIS 86773, *13 (W.D. Wis.).

Regardless, Nottestad would defeat La Crosse County under the Eighth Amendment standard as well. La Crosse County was aware of the limits of Med Cell 3. This is not a case in which a county needs notice of a problem before a factfinder could conclude that the La Crosse County was deliberately indifferent to it. There is simply no way an inmate who cannot walk could stay in Med Cell 3 under the LCCJ's policies without having to crawl across the floor of his cell to urinate or defecate into the toilet, which is part of that same floor. There is no way for an inmate who cannot stand to urinate or defecate from a sitting or standing position in Med Cell 3. Regardless, the record contains evidence that Nottestad did complain to officers about Med Cell 3. Officers also observed him directly every fifteen minutes and on the video surveillance system, which showed him defecating on his side, throwing his feces with his hand and attempting to wipe his hand on his blanket and smock. The officers have testified that County policy prevented them

from addressing Nottestad's conditions of confinement. La Crosse County's failure – indeed, refusal – to alter its policy is strong evidence of deliberate indifference.

The defendant relies on *Thomas v. Baldwin*, 2 F.4th 716 (7th Cir. 2021) in claiming that Nottestad's complaint should be dismissed. There are several differences between this case and *Thomas* that serve to distinguish it from Nottestad's case. First, the *Thomas* case was against a state prison, not a county jail, so the *Thomas* plaintiff was restricted to bringing only individual capacity claims against the defendants in that case. *Thomas*, 2 F.4th at 718. There was no *Monell* claim at present in the *Thomas* case. Second, the *Thomas* court applied a deliberate indifference standard. *Thomas*, 2 F.4th at 720-721. That standard, as stated above, does not apply in this case. Regardless, even if it did, the correction officers in this case repeatedly testified that *by policy* they were not allowed to address the inhumane conditions Nottestad faced. In *Thomas*, the defendants proved that they did respond to the plaintiff's concerns (albeit poorly). *Thomas*, 2 F.4th at 721-722. Because the *Thomas* decision does not apply to this case, the motion for summary judgment should be denied.

Not only did La Crosse County violate Nottestad's rights to be free from cruel and unusual punishment by being provided with the basic necessities of life and dignified conditions of confinement, but La Crosse County also violated Nottestad's rights with respect to Nottestad's serious medical condition. *Bradley*, at *14-15. As stated above, La Crosse County was knowledgeable of the consequences of its policy with respect to mobility-impaired inmates on suicide watch. *Whitney v. Khan*, 2021 U.S. Dist. LEXIS 5659, *11-12 (N.D. Ill.). Moreover, it was objectively unreasonable for La Crosse County, as a matter of policy, to ignore the needs of mobility-impaired inmates on suicide watch. *Id.*, at *11-12. La Crosse County simply did not

"treat" Nottestad left side paralysis: there is no dispute. Therefore, the motion for summary judgment should be denied on this ground, as well.

        B. Nottestad has proven that an official policy or practice caused the Constitutional deprivation.

To establish liability against a municipality under 42 U.S.C. sec. 1983, a plaintiff must be able to prove that his unconstitutional confinement conditions were caused by "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). *See also Coleman v. Dart*, 2019 U.S. Dist. LEXIS 25817, at *25 (N.D. Ill.).

    Nottestad has produced evidence that a La Crosse County policy exists. There is no dispute that inmates who cannot walk who are placed on suicide watch are not allowed devices by which they can ambulate. There is no dispute that, as a matter of policy, Nottestad was placed in a cell without even bars to enable him to lift and support himself. There is no dispute that, as a matter of policy, Nottestad was placed in a cell without running water and just a grate for a toilet. Multiple officers testified that they were following policy.

    But even if, technically, it was not La Crosse County's "policy" to place mobility-disabled suicidal inmates in a cell without wheelchairs, crutches, canes or leg braces; to place them in a cell with a toilet that was part of the same floor the inmate was forced to crawl over to urinate and defecate; in a cell without bars a disabled inmate could use to rise to a standing position and ambulate throughout the cell; and in a cell without running water, certainly the facts in this case establish that it was La Crosse County's *practice* to put mobility-limited suicidal inmates in this position. An issue of fact exists with respect to whether La Crosse County imposed a policy or

practice upon physically disabled suicidal inmates that deprived them of basic necessities and deprived them of their dignity, or that simply pretended that the inmate's disability did not exist. Even providing Nottestad with something as simple as an adult diaper would have solved the problem, but La Crosse County's policies forbade even this simple step. For these reasons, the motion for summary judgment should be denied.

V. CONCLUSION.

It is understandable that La Crosse County would have a policy to protect potentially suicidal inmates. However, that does not excuse La Crosse County from enforcing policies designed to protect suicidal inmates that torture suicidal inmates with mobility issues. La Crosse County had, under the Constitution, an obligation to provide for dignified conditions of confinement for all suicidal inmates, including those with mobility issues. Likewise, it had an obligation to adopt policies by which the county could treat mobility-impaired suicidal inmates while they were on suicide watch. There is, at a minimum, an issue of material fact concerning whether La Crosse County's policies or practices with respect to mobility-impaired inmates deprived them of their Eighth Amendment or Fourteenth Amendment rights. Therefore, the motion for summary judgment should be denied.

Dated this 14th day of October, 2022.

**GINGRAS, THOMSEN & WACHS, LLP**
Attorneys for Plaintiff

*/s/ Paul A. Kinne*

Paul A. Kinne (SBN: 1021493)
8150 Excelsior Drive
Madison, WI 53717

Tel: 608-833-2632
Fax: 608-833-2874
kinne@gtwlawyers.com