IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF JEFFERY NOTTESTAD, by its
special administrator Arianne Clark,

                Plaintiff,                            OPINION and ORDER

    v.

                                                  21-cv-535-jdp

LA CROSSE COUNTY,

                Defendant.

---

Jeffery Nottestad endured much hardship in his life. He suffered a stroke, which left half of his body paralyzed. Years later, Nottestad was suffering from deep depression, and he attempted to commit suicide by shooting himself. He survived, but after recovering in a hospital for more than a week, he was transferred to the La Crosse County jail for a probation violation. A few days later, Nottestad died in jail from complications related to undiagnosed duodenal ulcers.

This lawsuit isn't about Nottestad's death or his medical care. Instead, Nottestad's estate is suing La Crosse County for what the estate says were unconstitutional conditions of confinement—unrelated to his death—during the four days that Nottestad was detained at the jail.[1] Specifically, the estate says that the county subjected Nottestad to unsanitary conditions and failed to accommodate his disability. The county moves for summary judgment, Dkt. 31, and the court will grant the motion because the estate can't meet the standard for imposing liability on a municipality.

---

[1] The estate initially sued a medical contractor and several of its employees for failing to provide medical care, but the estate has since voluntarily dismissed all defendants except for the county. *See* Dkt. 15 and Dkt. 40.

The video recording of Nottestad in his cell shows that Nottestad's conditions of confinement at the La Crosse County jail were harsh and unpleasant. For more than two days, he was placed in a cell with only a mattress and grate in the floor for relieving himself. He wasn't allowed to use his leg brace or cane, so he struggled to stand up and move around his cell. He was either unable or unwilling to use the grate to defecate, meaning that he simply used the floor (and sometimes his hand) instead. Staff periodically came into clean his cell, but sometimes several hours passed with feces and urine on the floor.

The estate's claims fail because the estate hasn't identified an unconstitutional county policy or practice that caused the conditions. To begin with, many of Nottestad's harsh conditions were the result of him being on suicide watch, which was part of the hospital's discharge instructions. It was reasonable for jail staff to place Nottestad in a cell with minimal property and furnishings to reduce the risk of self-harm until mental health staff determined that Nottestad could be taken off suicide watch.

Even inmates on suicide watch are entitled to sanitary conditions, so Nottestad was entitled to accommodations that allowed him to use the toilet safely and hygienically. But county policies *do* require jail staff to accommodate disabled inmates, and jail staff complied with that policy by offering to assist Nottestad in using a regular toilet in a different cell. Nottestad refused those offers multiple times, so county policy wasn't the direct cause of Nottestad's difficulties using the toilet.

Jail staff could have done a better job of cleaning both Nottestad's cell and Nottestad himself while he was on suicide watch. But the estate doesn't point to a county policy or practice that was the reason for those failures. So even if jail employees subjected Nottestad to unsanitary conditions, there is no basis for holding the county liable for those conditions.

UNDISPUTED FACTS

The following facts are undisputed.

On January 22, 2020, Jeffrey Nottestad attempted to commit suicide by shooting himself. He was transported to the hospital, and he survived. He told hospital staff that he had been suffering from depression since his left side became paralyzed from a stroke approximately 15 years earlier, resulting in the end of his marriage and his business. Dkt. 34-1, at 2, 4, and 12.

Upon his discharge from the hospital on the evening of January 31, Nottestad was transported to the La Crosse County jail. The reasons for this aren't clearly stated in the records cited by the parties, but the parties agree that Nottestad had violated the conditions of his probation and that his probation agent made the decision to detain him. Dkt. 45, ¶¶ 1, 10.[2]

Nottestad was in a wheelchair when he was brought into the jail, but he also had with him a leg brace and a cane, which he normally used to walk. After he was booked, jail staff placed Nottestad in a padded cell to comply with the hospital's discharge instructions that Nottestad "must be on suicide precautions," including "safe room set-up to limit access to methods" of self-harm. Dkt. 34-1, at 6. All of Nottestad's time in the cell was recorded on video.

Nottestad was not allowed to keep his cane or his brace while on suicide watch, and he was not allowed to use a wheelchair. A nurse wrote in her progress note that he could have his

---

[2] The parties also agree that Nottestad "had an active warrant for his arrest" and that he was "a convicted felon who was not allowed to be in possession of a firearm," Dkt. 45, ¶ 3, but they don't expressly say whether he was detained for one or both of those reasons.

3

brace and cane "upon clearance from suicide watch" by a mental healthcare provider. Dkt. 35-28.

Inmates on suicide watch are given a smock and a blanket instead of a standard jail uniform. Suicide-watch cells have "minimal fixtures" to minimize the objects that an inmate can use to harm himself. Dkt. 45, ¶ 28. Nottestad's cell had a mattress rather than a bed. There was no toilet or sink. Instead, there was a grate on the floor covering a drain that inmates could use to urinate or defecate. Inmates were given toilet paper and cups of water, and the drain could be flushed from the outside by jail staff. The jail did have cells that were equipped with grab bars and wheelchair-accessible toilets, but there were no suicide-watch cells with those accommodations.

On Nottestad's first evening in the cell, an officer offered to physically assist Nottestad into a different cell with a toilet if Nottestad was having difficulty using the grate. Nottestad told the officer to "fuck off." Dkt. 29 (Schlict Dep. 7:22–8:4).

Nottestad urinated in his cell for the first time around 8:00 p.m. on January 31, a little more than two hours after being placed in the cell. Instead of using the grate, he urinated directly into a cup while sitting on the mattress and then set the cup on the ground.

Around 1:45 a.m. on February 1, Nottestad dumped the urine out of his cup, used the empty cup to urinate again, and again dumped the urine out in the direction of the grate. At 2:30 a.m., jail staff told Nottestad not to drink out of the cup that he urinated in and gave him a new cup of water.

Around 5:45 a.m., Nottestad again used a cup to urinate while sitting on the mattress and then set the cup on the floor. About 10 minutes later, an officer gave Nottestad a new cup

and took the old one. When the officer asked Nottestad why he urinated in the cup, Nottestad responded, "fuck you."

Around 6:15 a.m., an officer cleaned Nottestad's cell with a mop. The same officer moved Nottestad's mattress closer to the grate for "easier accessibility." Dkt. 45, ¶ 47.

Around 6:30 a.m, Nottestad repositioned himself and urinated directly into the grate.

Around 8:40 a.m., after receiving toilet paper from jail staff, Nottestad defecated onto the grate and then crawled back to the mattress. Around 11:15 a.m., an officer entered Nottestad's cell, saw the feces on the grate, and pushed them down the grate.

Around 2:45 p.m., Nottestad repositioned himself on the mattress and urinated onto the floor in the direction of the grate. Some of the urine may have made contact with Nottestad's blanket. Around 3:40 p.m., Nottestad said no when an officer asked if he needed anything.

Around 5:00 p.m., an officer offered to physically assist Nottestad to use a toilet in a different cell if Nottestad was having difficulty, but Nottestad again said, "fuck off."

Around 8:45 p.m., Nottestad repositioned himself on the mattress and urinated onto the floor in the direction of the grate. He then used a cup of water to rinse the urine into the grate.

Around 2:34 a.m. on February 2, Nottestad used the food slot on the cell door and the wall to help himself stand up. He then hobbled over to the grate and urinated into it before slowly maneuvering himself back onto the mattress. Between 4 and 5 a.m., Nottestad stood up using a similar method several times and walked around the cell using the wall as support. Just before 9 a.m., Nottestad stood up, leaned against the wall, and urinated into the grate.

Throughout the morning, Nottestad continued to get up and walk around for short amounts of time. Around 11:20 a.m., Nottestad asked staff for a wheelchair, but staff told him that a wheelchair wasn't allowed in the cell.

Around 12:15 p.m., Nottestad defecated onto the floor and then picked up the feces with a piece of toilet paper. A few minutes later, he moved the toilet paper to the grate and pushed it through.

Nottestad urinated around 4:30 p.m., 6:27 p.m., and 10:22 p.m. Each time, he remained lying down on the bed and urinated onto the floor in the direction of the grate. Afterwards, Nottestad's blanket sometimes touched the area where he urinated as he repositioned himself on the mattress.

Around 12:30 a.m. on February 3, Nottestad defecated onto the floor on the opposite side of the cell to the grate. He then threw the feces toward the grate, but it fell on the floor. A few minutes later, he scooted his body toward the grate and defecated onto the floor. While scooting his body, he dragged his foot through the feces, smearing it across the floor.

From around 2:30 a.m. to 2:45, Nottestad defecated into his hand and onto the floor multiple times. Each time, he then threw the feces toward the grate and repeatedly wiped his hands on his mattress and blanket. Numerous feces were lying on the ground near the grate at this time.

Around 6:45 a.m., jail staff entered the cell and cleaned it.

Around 8:00 a.m., staff gave Nottestad a standard jail uniform and transported him using a wheelchair to a mental health assessment. A clinical therapist determined that Nottestad could be removed from suicide watch.

Around 8:20 a.m., Nottestad was moved to a "standard" cell. Dkt. 45, ¶ 95. It contained an elevated slab with a mattress on top, a toilet, and a sink. He was not given his brace or cane because the nursing staff didn't communicate to correctional officers that he was allowed to have them after he was released from suicide watch.

While he was in the cell, he reached the toilet in different ways. Sometimes, Nottestad would stand up from the slab and use the wall to support himself until he reached the toilet. Other times, jail staff assisted Nottestad onto the toilet. On one occasion, Nottestad crawled to the toilet.

On February 4, an officer asked Nottestad if he wanted to be placed in a cell with a toilet on the other side of the wall so that it was more convenient for him to reach. Nottestad said yes, so he was moved to a different cell.

Approximately one hour later, Nottestad died in his cell. A doctor later determined that the cause of death was "complications of bowel perforating duodenal ulcers." Dkt. 45, ¶ 151.

During his detention at the jail, Nottestad had regular contact with jail and medical staff. He made multiple requests for medication and medical treatment, and he complained about being in jail and in the padded cell. But he never asked for an accommodation or assistance with using the toilet, and he never complained about the sanitary conditions of his cell.

## ANALYSIS

**A. Scope of the claims and legal standards**

The scope of the remaining issues in this case is narrow. The estate doesn't contend that the county is responsible for Nottestad's death or for failing to provide adequate medical

care. Rather, the estate contends that the county violated Nottestad's constitutional rights in two ways: (1) failing to provide him with a means to ambulate in his cell; and (2) subjecting him to unsanitary conditions. On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

A constitutional claim against a municipal defendant such as the county requires the plaintiff to prove four things: (1) a constitutional deprivation; (2) action or inaction by the municipal defendant that can be fairly described as the defendant's policy; (3) notice to the defendant that its policy would lead to constitutional violations; and (4) a direct causal connection between the defendant's policy and the constitutional injury. *See Bohanon v. City of Indianapolis,* 46 F.4th 669, 675 (7th Cir. 2022); *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986–87 (7th Cir. 2021); *Lapre v. City of Chicago,* 911 F.3d 424, 430–31 (7th Cir. 2018).[3]

A threshold question is which constitutional provision governs the estate's claims. The Eighth Amendment governs claims of convicted prisoners, and the Due Process Clause of the Fourteenth Amendment governs claims of pretrial detainees. *See Collins v. Al-Shami*, 851 F.3d

---

[3] The plaintiff may also prove a municipal liability claim with evidence of a constitutional violation by an official who is "responsible for establishing final policy, with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986). The estate doesn't rely on that avenue for proving municipal liability, so it isn't necessary to consider that question.

727, 731 (7th Cir. 2017). The parties say little about Nottestad's legal status in their briefs or proposed findings of fact, but they appear to agree that Nottestad was on a probation hold. The Court of Appeals for the Seventh Circuit hasn't expressly decided yet whether a person in that situation should be treated as a convicted prisoner or a pretrial detainee. *See Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017) (noting issue but declining to decide it); *Palmer v. Marion Cty.*, 327 F.3d 588, 592–93 (7th Cir. 2003) (same). But in *Smith v. Sangamon Cty. Sheriff's Dept.*, 715 F.3d 188, 191 (7th Cir. 2013), the court of appeals treated a plaintiff on a parole hold as a pretrial detainee without directly addressing the issue. And this court has assumed in multiple cases that the Due Process Clause governs the claims of a person detained on a probation or parole hold. *See Bennett v. Syed*, No. 20-cv-861-jdp, 2022 WL 1521761, at *5 (W.D. Wis. May 13, 2022); *Voss v. Marathon Cnty.*, No. 18-cv-540, 2021 WL 148732, at *3–4 (W.D. Wis. Jan. 15, 2021). Neither party develops an argument on the issue, and the outcome will be the same regardless of which provision applies, so the court will follow its approach from previous cases and apply the Due Process Clause.

The key difference between the Eighth Amendment and the Fourteenth Amendment for the purpose of a conditions-of-confinement claim is that the Eighth Amendment imposes a more stringent requirement on proving a defendant's intent or awareness of the potential harm to the incarcerated person. *See Hardeman v. Curran,* 933 F.3d 816, 823 (7th Cir. 2019). It is enough to show under the Due Process Clause that the defendant's conduct was unreasonable, meaning that the conduct wasn't "rationally related to a legitimate non-punitive governmental purpose" or that the actions were "excessive in relation to that purpose." *Id.*

But *Hardeman* didn't directly address the question of how serious the deprivation must be before it violates the Due Process Clause. The court framed the question as "whether the

9

severity and duration of the conditions [the inmate] experienced were so significant that . . . they violated the Constitution," without providing a metric for what is too severe or too long. *Id.* But the court cited the Eighth Amendment requirement that "prisons must provide inmates with the minimal civilized measure of life's necessities." *Id.* at 820 (internal quotation marks omitted). In her concurring opinion, Justice Sykes stated that every conditions-of-confinement claim under either the Eighth Amendment or the Fourteenth Amendment requires a showing that "the conditions in question are or were objectively serious," meaning that they "pos[e] a substantial risk of serious harm," *id.* at 826–27 (Sykes, concurring), which is an Eighth Amendment standard.

Neither side cites any cases in which the court of appeals has provided further clarity on the nature of the deprivation that is required to prove a conditions-of-confinement claim under the Due Process Clause. But in cases involving other claims by pretrial detainees, such as failures to protect and failures to provide medical care, the court has held that the nature of the deprivation is the same under the Eighth Amendment and the Fourteenth Amendment. *See Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022) (substantial risk of serious harm for failure-to-protect claim); *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (serious medical need for medical claim). In its brief, the estate assumes that the relevant standard is whether Nottestad was deprived of the minimal civilized measure of life's necessities, Dkt. 41, at 7, which is consistent with these cases.

In light of the guidance provided in *Hardeman*, *Thomas*, and *Williams*, the court concludes that the question is whether severity and the duration of the conditions were so significant that they either deprived Nottestad of the minimal civilized measure of life's necessities or subjected Nottestad to a substantial risk of serious harm.

**B. Unconstitutional deprivation**

For reasons explained in this section, the court concludes that the estate hasn't adduced evidence that jail staff refused to accommodate Nottestad's disability in violation of the Due Process Clause. But it is a closer question whether a reasonable jury could find that Nottestad was subjected to unsanitary conditions of a severity and duration that violated the Constitution.

**1. Failure to accommodate mobility issues**

The court understands the estate to contend that Nottestad was subjected to unconstitutional conditions of confinement because he had difficulty walking, standing, and using the toilet, both while he was on suicide watch and after he was transferred to a standard cell, and he did not have access to grab bars or his leg brace, cane, or wheelchair.

The court isn't persuaded that the lack of grab bars or other accommodations violated Nottestad's due process rights, for multiple reasons. First, Nottestad didn't have access to those items because the hospital instructed jail staff to place Nottestad on suicide watch. This court has previously recognized that harsh conditions that would otherwise be unconstitutional may be appropriate for short periods of time when they are imposed as part of an attempt to prevent self-harm. *See Williams v. Schmidt*, 14-cv-487-jdp, 2019 WL 1046167, at *2 (W.D. Wis. 2019); *see also Earl v. Racine Cnty. Jail*, 718 F.3d 689, 690 (7th Cir. 2013) (placement on suicide watch for five days under restrictive conditions didn't violate the Due Process Clause). And the court of appeals has recognized that grab bars present suicide risks because inmates can use grab bars to hang themselves. *Banks v. Patton*, 743 F. App'x 690, 697 (7th Cir. 2018). The estate identifies no way that jail staff that could place Nottestad in a cell that included the identified accommodations without undermining both the discharge instructions and jail staff's

11

constitutional duty to protect Nottestad from self-harm. *See Cavalieri v. Shepard*, 321 F.3d 616, 621 (7th Cir. 2003); *Sanville v. McCaughtry*, 266 F.3d 724, 740–41 (7th Cir. 2001).

Second, there was little standing or walking that Nottestad needed to do during the short time that he was detained at the jail, and the estate doesn't allege that walking or standing without grab bars caused Nottestad any significant pain. The video evidence shows that Nottestad stood up and walked around his cell many times even when he had no need to do so. The videos also show that he stood up slowly and needed to lean against the wall for support, but that sort of difficulty isn't enough to show a constitutional violation under circuit precedent. *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 671 (7th Cir. 2012) (evidence that the plaintiff's "use of the toilets and showers . . . was made more difficult by the absence of grab bars" not enough for Eighth Amendment violation); *cf. Wagoner v. Lemmon,* 778 F.3d 586, 592–93 (7th Cir. 2015) (allegation that prisoner was "inconvenienced with longer waits and humiliation, as when he had to crawl off the regular van because it did not accommodate his wheelchair" didn't support violation of American with Disabilities Act). If jail staff had refused to return Nottestad's leg brace and cane for a longer period of time or if Nottestad had needed to walk more while he was at the jail, this would be a stronger argument. But in light of the short time at issue and the minimal need for walking during that time, the estate can't prove a due process violation based on the lack of accommodations to help Nottestad to walk around the cell.

There is stronger evidence that Nottestad needed an accommodation to use the toilet. A reasonable jury could infer from the video evidence that it was virtually impossible for Nottestad to defecate safely or hygienically while he was in the suicide-watch cell, which contained only a grate rather than a regular toilet. That problem implicated not just Nottestad's

physical health, but also his dignity, which is a fundamental concept underlying the Supreme Court's jurisprudence on conditions of confinement. *See Brown v. Plata*, 563 U.S. 493, 510 (2011).

But even if lack of access to a regular toilet violates the Constitution, this claim has another problem, which is that jail staff didn't require Nottestad to use the grate to relieve himself. Rather, on both evenings that Nottestad was in the suicide-watch cell, staff offered to assist Nottestad in using a toilet in a different cell, and both times Nottestad refused the offer by telling staff to "fuck off." Nottestad also never asked for assistance to use the toilet, even though he made multiple requests for other types of assistance. Perhaps jail staff could have been more insistent with Nottestad to accept help, especially after it became clear that he was repeatedly urinating and defecating on the floor. But the estate cites no authority for the view that staff are required to *force* an inmate to accept an accommodation to comply with the Due Process Clause, and the court is not aware of any authority. So the court concludes that the county is entitled to summary judgment on the estate's claim that Nottestad's due process rights were violated by the lack of accommodations for ambulating in his cell or using the toilet.

2. **Unsanitary conditions**

Nottestad was exposed to both urine and feces throughout his time on suicide watch because of his difficulties using the grate.[4] The court of appeals has held that exposure to unsanitary conditions such as human excrement may violate the Constitution. *See, e.g., Hardeman*, 933 F.3d at 820–21; *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013); *Rice ex rel.*

---

[4] This was not an issue after Nottestad was transferred to a standard cell because Nottestad was able to use the toilet in that cell through a combination of his own efforts and assistance from jail staff.

13

*Rice v. Correctional Medical Services*, 675 F.3d 650, 665–66 (7th Cir. 2012); *Wheeler v. Walker*, 303 Fed. Appx. 365, 368 (7th Cir. 2008); *Vinning–El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007); *Johnson v. Pelker*, 891 F.2d 136, 139–40 (7th Cir. 1989). But this case doesn't involve a straightforward application of those precedents, for two reasons.

First, the estate doesn't contend that Nottestad's cell was unsanitary when he entered it. Rather, it became so only because Nottestad urinated and defecated on the floor and elsewhere in the cell. As already noted, Nottestad refused offers from jail staff to assist him in using the toilet. In the context of the Eighth Amendment, the court of appeals has looked skeptically at claims about unsanitary conditions when the prisoner caused those conditions himself: "If feces were on the wall—but [the prisoner] put it there—the claim on this point that the defendants violated the Eighth Amendment would lose a lot of its steam. . . . [A]n inmate who causes filthy conditions to exist may not have a cruel and unusual leg to stand on." *Isby v. Clark*, 100 F.3d 502, 505–06 (7th Cir. 1996). In *Rice*, 675 F.3d at 665–66, the court reaffirmed that it is relevant to a claim of unsanitary conditions that the inmate himself caused them. But the court qualified the point, concluding that jail staff could still be held liable for failing to bathe an inmate and clean his cell because of evidence that the inmate was mentally ill. *Id.* The estate doesn't allege that Nottestad refused assistance because of a mental illness, so it isn't clear whether the reasoning of *Rice* would apply.

Second, *Hardemann* and the cases cited above involved exposures that were longer lasting, more severe, or combined with harm to the prisoner's health.[5] In this case, there was

---

[5] *See Hardeman*, 933 F.3d 816, 819–20 (three-day water shutdown led to "hundreds of toilets holding feces and urine," which "produced a powerful and putrid smell," attracted insects, and "caused numerous ailments, including dehydration, migraine headaches, sickness, dizziness, constipation, and general malaise"); *Budd*, 711 F.3d at 842 (unsanitary conditions caused an infection and were combined with lack of heat and bedding, blocked ventilation, overcrowding,

14

never a delay of more than a few hours before jail staff came into Nottestad's cell to clean it, and the estate doesn't allege that any of Nottestad's health problems were caused or exacerbated by the conditions of the cell. On the other hand, even a short-term exposure to feces and urine "evokes . . . the more general standards of dignity embodied in the Eighth Amendment." *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001). The county doesn't explain why staff sometimes waited several hours after Nottestad urinated or defecated on the floor before coming into the cell clean it or why they failed to assist Nottestad with cleaning himself. Jail staff were monitoring Nottestad at least once every 15 minutes, so it is reasonable to infer that they would have been aware of Nottestad's cell conditions. The county says that staff waited until it was "safe" to enter Nottestad's cell, but the county doesn't explain what that means. *See* Dkt. 45, ¶¶ 46, 88.

In light of the uncertainty in the law, the court will assume for the purpose the county's summary judgment motion that the severity and duration of Nottestad's exposure to human waste was significant enough to violate the Due Process Clause and that jail staff unreasonably delayed in cleaning both Nottestad's cell and Nottestad himself.

## C. County liability

If Nottestad suffered an unconstitutional deprivation, the next question would be whether the county can be held liable for that deprivation. The estate doesn't allege that the

---

and inadequate recreation); *Rice*, 675 F.3d at 665–66 ("[U]neaten food was allowed to accumulate in Rice's cell, . . . he went for long periods without being showered, and . . . the stench of his cell and his person were overwhelming."); *Wheeler*, 303 Fed. Appx. at 368 ("[F]or two weeks prison guards, without explanation, ignored [the inmate's] requests for basic cleaning supplies while he was exposed to a combination of a heavy roach-infestation, filth, and human waste."); *Vinning–El*, 482 F.3d at 924–25 (prisoner was held for six days without sanitation items in cell contaminated with human waste and in which sink and toilet did not work); *Johnson*, 891 F.2d at 139–40 (prisoner was denied cleaning supplies and confined for three days to cell that was smeared with human waste and lacked running water).

15

county has a policy of exposing inmates to human waste or refusing to accommodate disabled prisoners. Instead, the estate blames the county for the design of the cells (no grab bars and no raised toilet in the suicide-watch cell) and the refusal to allow Nottestad to keep a cane or wheelchair in his cell. The estate also says that the county has a policy or practice of failing to provide inmates in Nottestad's situation with disposable undergarments.

The court has already concluded that the lack of grab bars, a wheelchair, or Nottestad's leg brace and cane in his cell didn't violate the Constitution, so it isn't necessary to consider whether the county had a policy that led to those conditions. As for the exposure to unsanitary conditions, a disabled prisoner on suicide watch has the right to *some* accommodation so that he may maintain his hygiene. But the county does have a policy requiring its staff to accommodate disabled inmates. It directs staff to "assist an inmate with a disability by accommodating the inmate consistent with any guidelines related to the inmate's disability," it directs intake staff to ask inmates about needed accommodations during intake, and it creates a process for evaluating accommodation requests from an inmate after initial entry. Dkt. 44-6.

The estate doesn't challenge the adequacy of the accommodation policy except to say that it should include a requirement to provide disposable undergarments to inmates on suicide watch who have mobility impairments. That is one way that a disabled prisoner could be accommodated. But even under federal disability statutes—which impose stricter accommodation requirements than the Constitution—a public entity has discretion to choose among reasonable accommodations. *See Norfleet v. Gaetz*, 820 Fed. Appx. 464, 469–70 (7th Cir. 2020) ("[The Department of Corrections] was not required to provide a perfect accommodation, or the one preferred by [the prisoner]."). In this case, the county requires staff to ask inmates about needed accommodations and to consider accommodation requests

16

submitted by inmates. And staff complied with this policy by offering on multiple occasions to assist Nottestad in using the toilet in a different cell and by helping him use the toilet in the standard cell. If Nottestad had accepted assistance in the suicide-watch cell, Nottestad could have avoided the difficulties and indignities of using the grate toilet and the exposure to his own waste.

The estate says in its brief that "[t]he officers have testified that County policy prevented them from addressing Nottestad's conditions of confinement." Dkt. 41, at 10–11. But the estate cites no testimony to support that statement. In its proposed findings of fact, the only example the estate cites of an officer's refusal to accommodate Nottestad is Nottestad's request for a wheelchair while he was on suicide watch. Dkt. 46, ¶¶ 92–93. But, as the court has already discussed, it was reasonable to limit Nottestad's property to prevent him from engaging in self-harm. In any event, the estate doesn't explain how a wheelchair would have helped Nottestad use the toilet or how the lack of a wheelchair while he was on suicide watch violated his constitutional rights.

As for jail staff's failure to clean Nottestad's cell or Nottestad himself more promptly, any claim against the county based on a delay in cleaning fails because the estate says nothing in its proposed findings of fact or brief about a policy or practice related to cleaning up after an inmate. So the estate forfeited that issue. *See Rice*, 675 F.3d at 677 (dismissing municipal claim based on unsanitary cell conditions because the plaintiff "made no effort to identify a policy or practice that would support a finding that [the municipal defendant] itself was deliberately indifferent to the plight of mentally ill prisoners like Rice").

The bottom line is that the estate's claims against the county fail because the estate hasn't shown that the county had notice that any of its policies or practices would lead to

17

constitutional violations or that there was a direct causal connection between a policy or practice and the constitutional injury at issue. Generally, notice is shown either through past constitutional violations or with evidence that constitutional violations are the obvious consequence of the policy or practice. *Bohanon*, 46 F.4th at 675; *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 240 (7th Cir. 2021). The estate doesn't point to any past violations that would have given the county notice, and the estate doesn't explain why it should have been obvious to the county that a disabled inmate would not only fail to ask for a needed accommodation but would affirmatively refuse offers of assistance. Perhaps the county could improve its policies by providing more explicit guidance on how staff should accommodate disabled inmates on suicide watch or on what staff should do when an inmate who needs accommodation refuses to accept it. But the possibility of a better policy isn't enough in itself to provide notice of likely constitutional violations. *See Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020).

An inmate should not have to lie next to feces and urine, and a disabled inmate should receive accommodations necessary for a safe and sanitary environment. A reasonable jury could find that Nottestad's conditions weren't sanitary while he was on suicide watch, but the estate can't prove that an unconstitutional policy or practice of the county is what caused those conditions, so the county is entitled to summary judgment.

ORDER

IT IS ORDERED that La Crosse County's motion for summary judgment, Dkt. 31, is GRANTED. The clerk of court is directed to enter judgment in the county's favor and close the case.

Entered December 12, 2022.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge